ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| COUNTY OF MARLBORO | ) | C/A NO.: 2024-CP-34- |
| | ) | |
| Lamill Holding Company, and | ) | |
| AGA Capital, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | *(Jury Trial)* |
| | ) | |
| Bitmain Technology Georgia Limited, | ) | |
| | ) | |
| Defendant(s). | ) | |

# SUMMONS

**TO:    THE ABOVE-NAMED DEFENDANT(s), Bitmain Technology Georgia Limited:**

You are hereby summoned and required to appear and defend by answering the Complaint in this action, a copy of which is served upon you with this Summons and to serve a copy of your answer on Robert E. Lee, Esquire at Post Office Box 1096, Marion, South Carolina 29571 within thirty (30) days after this service excluding the day of this service. If you fail to answer, judgment by default will be rendered against you for the relief demanded in the Complaint.

**ROBERT E. LEE, LLC**

s/Robert E. Lee
Robert E. Lee — S.C. Bar No. 63052
Post Office Box 1096
Marion, South Carolina 29571
Telephone:    (843) 423-1313
Facsimile:    (843) 423-1397
rel@rellawfirm.com

July 25, 2024                                              **ATTORNEY FOR THE PLAINTIFFS**
Marion, South Carolina

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF MARLBORO | ) | C.A. No. 2024-CP-34- |
| | ) | |
| LAMILL HOLDING COMPANY, and AGA CAPITAL, LLC, | ) ) | |
| | ) | |
| Plaintiffs, | ) | **COMPLAINT** |
| | ) | |
| v. | ) | |
| | ) | |
| BITMAIN TECHNOLOGY GEORGIA LIMITED, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The Plaintiffs, Lamill Holding Company, ("Lamill") and AGA Capital, LLC ("AGA," together with Lamill, the "Plaintiffs"), complaining of the Defendant, Bitmain Technology Georgia Limited ("Bitmain" and the "Defendant") alleges the following:

### JURISDICTION AND VENUE

1.      Plaintiff, Lamill Holding Company, is a corporation organized and existing pursuant to the laws of the state of Delaware owning general intangibles in South Carolina.

2.      Plaintiff, AGA Capital, LLC, f/k/a AGA Mining, LLC, is a limited liability company organized and existing pursuant to the laws of the state of Delaware owning general intangibles in South Carolina.

3.      Upon information and belief, Defendant, Bitmain Technology Georgia Limited, is a corporation organized and existing pursuant to the laws of the state of Georgia, doing business in Marlboro County, South Carolina.

4.      This Court has jurisdiction based upon Article V of the South Carolina Constitution, S.C. Code Ann. §§ 15-7-30; 15-53-10 et seq. (2005); and its plenary powers.

5.      Jurisdiction is proper in this Court and venue is proper in Marlboro County, South Carolina. The Defendant entered one or more contracts, to be performed in whole or in part in Marlboro County, South Carolina.  The Defendant has and presently conducts business in South Carolina, including, upon information and belief, operating a business in Marlboro County, South Carolina. A substantial part of the events giving rise to the

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

claims alleged by Defendant in its matter before the American Arbitration Association occurred in Marlboro County, South Carolina.

**GROUNDS FOR RELIEF**

6.      This action for declaratory judgment is brought pursuant to S.C. Code Ann. §§ 15-7-30; 15-53-10 et seq. to determine the rights of the parties under a contract dated August 5, 2023, which is attached hereto as Exhibit "A" and incorporated herein by reference thereto (the "Agreement").

7.      Pursuant to S.C. Code Ann. § 15-53-30, Plaintiffs seek a declaration as to whether the Plaintiffs, non-signatories to the Agreement can be compelled under that same agreement to arbitrate tort causes of action brought by the Defendant against them with no relation to that same agreement.

8.      Further and pursuant to S.C. Code Ann. § 15-48-20, Plaintiffs seeks an order staying the arbitration proceeding commenced by the Defendant

9.      Pursuant to S.C. Code Ann. § 15-48-10, the Agreement is not an agreement to arbitrate as it was not made between the parties, namely the Plaintiffs.

10.      The Plaintiffs have never agreed to the arbitration of any claims between them and the Defendant and have never signed an agreement agreeing to the same.

11.      The Defendant is aware that no agreement to arbitrate between the Plaintiffs and the Defendant exists.

12.      Despite possessing this knowledge, the Defendant instituted an arbitration proceeding with the American Arbitration Association by way of filing a demand on June 3, 2024 (the "Demand").

13.      The Defendants, represented by experienced and competent counsel, did not serve the Plaintiffs with notice of the Demand and, rather, attempted to continue the proceedings after only emailing the same to the actual signatory to the Agreement.

14.      The question of the arbitrability of a claim is an issue for judicial determination. The Defendant has failed to file an action in Circuit Court in accordance with S.C. Code Ann. § 15-48-20.

15.      By continuing to attempt to proceed with the arbitration process, the Defendant is attempting to deprive the Plaintiffs of their due process and important substantive, procedural, and constitutional rights.

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

16.    The claims brought by Defendant against the Plaintiffs sounds exclusively in the tort of veil piercing or alter ego. The Demand itself does nothing more than recite basic elements to such a claim with no factual basis supporting them. The claim does not reference, in any sense related to, or arise under and of the claims it may have in the Demand against the signatory to the Agreement.

17.    Plaintiffs seek the determination and declaration that the claims of Defendant are not subject to arbitration, and that the underlying contract does not allow for the mandatory arbitration demanded by the Defendant.

18.    The arbitration process instituted by the Defendant was started and continued unilaterally by the Defendant to the extreme prejudice of the Plaintiffs.

19.    The Defendant persists in the arbitration process when it knows that the claims are not subject to mandatory arbitration and the Plaintiffs have never agreed to arbitration or signed an arbitration agreement.

20.    The Defendant has no contractual right to compel arbitration.

21.    The Plaintiffs have made no appearance in the arbitration process, have neither filed any responsive pleadings to the Defendant's Demand nor engaged in any discovery in the arbitration process.

22.    The Plaintiffs have been required to incur unnecessary attorney's fees and costs due to the actions of the Plaintiff and requests that they be granted judgment against the Defendant for all its attorney's fees and costs.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray as follows:

a.  This Court enter an order staying the arbitration process immediately.

b.  This Court enter an Order declaring that the claims of Defendant against Plaintiffs in its Demand are not subject to arbitration under the terms of the Agreement.

c.  That this Court grant Plaintiffs judgment against the Defendant for their attorney's fees, costs, and litigation expenses; and

d.  That this Court award such further relief that the court deems necessary and proper.

(SIGNATURE ON THE FOLLOWING PAGE)

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

# ROBERT E. LEE, LLC

s/Robert E. Lee

_____

Robert E. Lee – S.C. Bar No. 63052
Post Office Box 1096
Marion, South Carolina 29571
Telephone:    843-423-1313
Facsimile:    843-433-8258
E-Mail:        rel@rellawfirm.com

July 25, 2024                    **ATTORNEY FOR THE PLAINTIFFS**
Marion, South Carolina

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249



| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
|---|---|---|
| COUNTY OF MARLBORO | ) | C.A. No. 2024-CP-34- |

LAMILL HOLDING COMPANY, and
AGA CAPITAL, LLC,

        Plaintiffs,

v.

BITMAIN TECHNOLOGY GEORGIA
LIMITED,

        Defendant.

## AFFIDAVIT OF RICHARD GLEISSNER

    PERSONALLY APPEARED before me, an officer duly authorized by law to administer oaths, Richard Gleissner, who after first being duly sworn, states:

1. My name is Richard Gleissner, and I am competent in all respects to testify regarding the matters set forth herein.

2. I and my firm are, and have been at all times relevant herein, the attorneys for Bennettech LLC.

3. Bennettech LLC is a named party in an arbitration proceeding instituted by Bitmain Technology Geogia Limited (the "Defendant") with the American Arbitration Association; Arbitration Case No. 01-24-0005-7869 (the "Arbitration Proceedings").

4. The Arbitration Proceedings were instituted by way of a demand filed by the Defendant on June 3, 2024 (the "Demand").

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

5. A true and correct copy of the agreement attached to the Demand, incorporated therein, and relied upon for purposes of asserting an agreement to arbitrate among the named parties is attached hereto as Exhibit "A".

6. Lamill Holding Company, ("Lamill") and AGA Capital, LLC, formerly AGA Mining, LLC ("AGA," together with Lamill, the "Plaintiffs") were both named parties to the Demand.

7. Neither Plaintiff are named parties to the agreement attached to the Demand.

8. The Defendant continues to persist in its prosecution of its claims in the Arbitration Proceedings.

9. The claims brought by Defendant against the Plaintiffs sound exclusively in the tort of veil piercing or alter ego. The Demand itself does nothing more than recite basic elements to such a claim with no factual basis supporting them. The claim does not reference, in any sense related to, or arise under and of the claims it asserts under the alleged agreement attached to the Demand.

**FURTHER AFFIANT SAYETH NAUGHT**

_(signature)_

Richard R. Gleissner

Sworn to and subscribed before
Me this 25 day of July 2024

_(signature)_

Notary Public, State of South Carolina
My Commission Expires: April 12, 2033



Page 2 of 2

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

# BITMAIN

v6.4.0

## SERVICE FRAMEWORK AGREEMENT

THIS AGREEMENT (the "Agreement") is made on August 5, 2023.

BETWEEN:

(1)    BITMAIN TECHNOLOGIES GEORGIA LIMITED, a corporation incorporated under the laws of the State of Georgia, the United States of America (File No. 21203283), having its registered office at 900 Old Roswell Lakes Parkway, Suite 310, Roswell, GA 30076 ("BITMAIN"); and

(2)    BENNETTECH LLC, a limited liability company formed under the laws of the state of South Carolina, the United States of America (File No. 230424-1529418), having its registered office at 215 East Bay St, Suite 201k #1712, Charleston, South Carolina 29401    ("Service Provider").

Each of the parties to this Agreement is referred herein individually as a "Party" and collectively as the "Parties".

WHEREAS:

(A)    Service Provider is the owner and operator of the Data Center Facility (as defined below) and provides Services (as defined below) at the Data Center Facility.

(B)    BITMAIN intends to situate the Hosted Servers (as defined below) at the Data Center Facility and receive Services from Service Provider in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants set forth in this Agreement, the parties agree as follows:

1.    DEFINITIONS AND INTERPRETATIONS

1.1.    In this Agreement, these expressions have the following meanings:

"Actual Hosting Unit Price" means the effective unit price per kWh applicable during the relevant Billing Period under the applicable Billing Service Order, which shall initially be the same as the Normal Hosting Unit Price set forth in such Service Order, subject to the adjustment mechanism in accordance with Article 3.2 and/or Article 6.9(c) (if applicable).

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly Controls, is Controlled by, or is under common Control with such Person.

"Applicable Law" means any treaty, law, decree, order, regulation, decision, statute, ordinance, rule, directive, code or other document that has legal force under any system of law, including, without limitation, local law, law of any other state or part thereof or

Doc ID. 598fea432b908deda545251098a18e798c661706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

BITMAIN                                                                                    v6.4.0

international law, and which creates or purports to create any requirement or rule that may affect, restrict, prohibit or expressly allow the terms of this Agreement or any activity contemplated or carried out under this Agreement.

"**Billing Period**" means the period of approximate one (1) month for which Service Provider issues invoices to BITMAIN for the Services provided by Service Provider during such period, the determination of which shall follow the following principle: (a) the first Billing Period shall commence from 00:00 (Beijing Time) on the Initial Date until 23:59 (Beijing Time) on the last calendar day of the same month, and (b) each of the subsequent Billing Periods shall commence from 00:00 (Beijing Time) on the first calendar day of the month following the previous Billing Period until 23:59 (Beijing Time) on the last calendar day of such month.

"**Business Day**" means a day (other than Saturday, Sunday or public holiday) on which banking institutions in the Relevant Jurisdiction are open generally for business.

"**Control**" means, with respect to any Person, the power or authority, whether exercised or not, to direct the business, management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, provided that, in the case of a Person that is an entity, such power or authority shall conclusively be presumed to exist upon possession of beneficial ownership or power to direct the vote of more than fifty percent (50%) of the votes entitled to be cast at a meeting of the holders of the shares or other equity interests or registered capital of such Person or power to control the composition of a majority of the board of directors or similar governing body of such Person. The terms "**Controlled**" and "**Controlling**" have meanings correlative to the foregoing.

"**Data Center Facility**" means the data center facility owned and operated by Service Provider, details of which shall be submitted to BITMAIN in the form set forth in EXHIBIT A of APPENDIX I hereto, where Service Provider provides the Services to BITMAIN pursuant to the applicable Service Order(s).

"**Delayed Compensation**" means the corresponding amount payable by either Party as compensation for its delayed performance in accordance with Articles 3.4(A)(b), 3.4(A)(c) and 3.4(A)(d).

"**Deposit**" means the amount payable by BITMAIN to Service Provider equal to one (1) month of the theoretical amount of the Hosting Fees for one Billing Period, based on the Hosting Quantity for the respective batch of the Hosted Servers, calculated in accordance with the following formula: Deposit = Hosting Quantity for the respective batch of the Hosted Servers × 3.6 (kW) × Normal Hosting Unit Price × 24 ×30; the specific amount of the Deposit shall be initially set forth in paragraph 3.1 of the applicable Service Order, subject to the adjustment in accordance with Article 6.1(b) and/or Article 6.1(e) (if applicable).

Doc ID: 598fea432b908deda545251098a18e788c661706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

BITMAIN                                                                                              v6.4.0

"**Digital Assets Price**" means the price of the applicable digital asset at the relevant hour (Beijing Time), denominated in US Dollars and published on the website of Coinmarketcap (https://coinmarketcap.com/).

"**End-Period Meter Reading**" means the meter reading of the Separate Meter taken at 23:59 (Beijing Time) on the last day of the applicable Billing Period.

"**Force Majeure**" means in respect of either Party, any event or occurrence whatsoever beyond the reasonable control of that Party, which delays, prevents or hinders that Party from performing any obligation imposed upon that Party under this Agreement, including to the extent such event or occurrence shall delay, prevent or hinder such Party from performing such obligation, war (declared or undeclared), terrorist activities, acts of sabotage, blockade, fire, lightning, acts of god, national strikes, riots, insurrections, civil commotions, quarantine restrictions, epidemics, earthquakes, landslides, avalanches, floods, hurricanes, explosions and regulatory and administrative or similar action or delays to take actions of any governmental authority.

"**Hosted Servers**" means the supercomputing servers and ancillary hardware equipment owned by BITMAIN or its designated third party(ies) and hosted at the Data Center Facility pursuant to the applicable Service Order.

"**Hosting Capacity**" shall have the meaning ascribed to it in the applicable Service Order.

"**Hosting Fee(s)**" means the fee for the Services payable by BITMAIN to Service Provider based on the Power Consumption during the applicable Billing Period, which shall be calculated in accordance with Article 3.1. For the avoidance of doubt, in no event shall the Hosting Fee be determined in accordance with the quantity of Hosted Servers.

"**Hosting Fee Ratio**" means the ratio of the Hosting Fee to the Theoretical Hashrate PPS Income during the relevant period.

"**Hosting Quantity**" means the agreed quantity of the Hosted Servers in accordance with the applicable Service Order, for which Service Provider shall provide the Hosting Capacity, the details of which shall be initially set forth in paragraph 2 of the applicable Service Order and subject to adjustment in accordance with paragraph 2.3 of the applicable Service Order, Article 6.1(b) and/or Article 6.1(e) herein, or other adjustment as agreed by the Parties; provided that the adjustment shall be confirmed in writing by the Parties by either emails or a supplemental agreement hereto.

"**Initial Date**" means the date on which the Hosted Servers under the Service Order, or the first batch of Hosted Servers if there are more than one batch under the Service Order, are powered-on for normal hosting and operation (i.e., September 30, 2023).

Doc ID: 598faa432b906deda545251098a18a788c661706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

# BITMAIN

v6.4.0

"**Inventory Assets**" means any asset stored or kept by BITMAIN at the Data Center Facility other than the Hosted Servers, which may include, without limitation, servers or hardware equipment that are damaged, defective, malfunctioning or not operating, servers or hardware equipment that are returned for maintenance and repair, servers or hardware equipment that are backup to the Hosted Servers, the spare parts and components for the maintenance and repair of the Hosted Servers, and the packaging materials for the Hosted Servers.

"**Knowledge**" means with respect to Service Provider, the actual knowledge of Service Provider, and that knowledge which should have been acquired by Service Provider after making such due inquiry and exercising such due diligence as a prudent business person who would have made or exercised in the management of its business affairs, including but not limited to due inquiry of all necessary officers, directors and professional advisers of Service Provider and its Affiliates who could reasonably be expected to have knowledge of the matters in question.

"**Low Power Mode**" means Hosted Servers operate in such a mode that consumes less amount of electrical power than Rated Power and contribute less hashrate than Rated Hashrate due to the limitation on its performance imposed by and subject to the sole discretion of BITMAIN.

"**Minimum Power Commitment**" means the commitment of power consumption of Service Provider pursuant to the applicable Power Purchase Agreement, the failure to utilize electrical power under which, or the failure to make payment of which regardless of the actual utilization, will constitute a breach of contract under such Power Purchase Agreement. The specific amount of the Minimum Power Commitment shall be set forth in the applicable Information Memorandum of Data Center Facility.

"**Minimum Hosting Unit Price**" shall have the meaning ascribed to it in the applicable Service Order.

"**Monitoring Software**" means the software designated by the Parties to monitor the operation of the Hosted Servers, which shall be AntSentry (version V2 or such other version as may be upgraded by BITMAIN from time to time) unless otherwise mutually agreed between the Parties in the applicable Service Order.

"**Monthly Theoretical Hosting Fee**" means the theoretical amount of the Hosting Fee for one (1) month, which shall be calculated in accordance with the following formula: Monthly Theoretical Hosting Fee = $\sum$ Rated Power of Each Hosted Server Powered-On (kW) $\times$ Normal Hosting Unit Price $\times$ 24 $\times$ 30.

"**Normal Hosting Unit Price**" shall have the meaning ascribed to it in the applicable Service Order.

Doc ID: 598fea432b908deda545251098a18e788c661706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249



v6.4.0

"**Online Status**" means the status of a Hosted Server that is powered-on with constant supply of electrical power, has stable connection with network and is accessible via the Monitoring Software where the status tag "Online" is indicated for such Hosted Server.

"**Online Status Ratio**" means a fraction where the numerator is the sum of the actual length of time of each Hosted Server in Online Status during the applicable Billing Period, and the denominator is the product of the Hosting Quantity of Hosted Servers and the theoretical length of time of each Hosted Server in Online Status during the applicable Billing Period. The Online Status Ratio shall finally be determined by the data as illustrated on the Monitoring Software, except that if there is a technical failure (including, but not limited to, technical failure of the Monitoring Software and/or the Hosted Servers, or offline of the NUC, etc.) that prevents from reading certain data, the aforementioned numerator and denominator shall be adjusted accordingly to subtract such time during which the relevant data cannot be read due to such technical failure, unless otherwise agreed by the Parties. For the avoidance of doubt, calculation of Online Status Ratio for purposes of Article 3.9 shall not be adjusted for any technical failures.

"**Permitted Disputed Items**" has the meaning ascribed to such term in Article 3.6(b)(iv).

"**Person**" means any individual, corporation, partnership, limited partnership, proprietorship, association, limited liability company, firm, trust, estate or other enterprise or entity (whether or not having separate legal personality).

"**Power-off Server(s)**" means Hosted Server(s) that is/are powered off voluntarily by BITMAIN pursuant to Article 5.1.

"**Power Consumption**" means the amount of electrical power consumed by the Hosted Servers during the applicable Billing Period, including any of the Hosted Servers under the Low Power Mode, which shall be determined by subtracting the End-Period Meter Reading of the Billing Period immediately preceding the relevant Billing Period from the End-Period Meter Reading of the relevant Billing Period, the unit of which shall be kWh.

"**Power Purchase Agreement**" means the power purchase agreement, or other similar agreement for procurement of electrical power for the Data Center Facility, entered into between Service Provider and the relevant power supplier of the Data Center Facility.

"**Rated Hashrate**" means the rated hashrate stated on the factory label of the applicable Hosted Server.

"**Rated Power**" means the amount of the rated electrical power stated on the factory label of the applicable Hosted Server.

Doc ID: 598fea432b908deda545251098a18e788c661706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

BITMAIN                                                              v6.4.0

"**Reconciliation Statement**" means the statement issued by Service Provider to BITMAIN every Billing Period for reconciliation between the Parties, which shall set out details including but not limited to Power Consumption, the applicable Actual Hosting Unit Price, the Online Status Ratio, Hosting Fees chargeable, any occurrence of interruption or suspension of any Service during such Billing Period, the form of which is set out in APPENDIX II hereto.

"**Relevant Jurisdiction**" means the State of Georgia of the United States of America.

"**Separate Meter**" means the separate meter installed by Service Provider at the Data Center Facility for metering the electrical power consumed by the Hosted Servers.

"**Service**" means the hosting service(s) provided by Service Provider to BITMAIN pursuant to this Agreement subject to the actual service(s) agreed between the Parties in the applicable Service Order. For the avoidance of doubt, the Parties agree and acknowledge that the Service does not include any operation or maintenance of Hosted Servers.

"**Service Order(s)**" means the Service Order(s) executed by the Parties in the form set out in APPENDIX I hereto, as amended from time to time in accordance with this Agreement.

"**Theoretical Hashrate PPS Income**" means the theoretical earnings of the applicable Hosted Server based on the Rated Hashrate of such Hosted Server with reference to the prevailing network difficulty during the relevant period and the Digital Assets Price, which shall be calculated based on the real-time total network hashrate and the price of Bitcoin (BTC), with a sampling frequency of once an hour on a credible third-party platform[1], and the average value of the relevant data in each relevant period shall be the Theoretical Hashrate PPS Income of such period, the specific value shall be determined by the data as illustrated on the Monitoring Software. For avoidance of doubt, the Parties agree that: (a) when calculating the Hosting Fee Ratio for the Actual Hosting Unit Price Adjustment in accordance with Article 3.2 or the provision of Incentive Coupon in accordance with Article 3.9, the relevant period shall be the corresponding Billing Period; (b) when calculating the Hosting Fee Ratio for the voluntary power-off in accordance with Article 5, the relevant period shall be the consecutive 24*14 hours as stipulated in Article 5.1.

1.2.    In this Agreement, unless otherwise specified:

   (i)     words importing the singular include the plural and vice versa where the context so requires;

---

[1] Unless otherwise specified by BITMAIN, the third-party platform shall be the website of Coinmarketcap (https://coinmarketcap.com/).

Doc ID: 598fea432b908deda545251098a18e788c661706



BITMAIN

v6.4.0

(ii)   the headings in this Agreement are for convenience only and shall not be taken into consideration in the interpretation or construction of this Agreement;

(iii)   references to Articles and Appendix(es) are references to the articles and appendix(es) of this Agreement;

(iv)   references to days, dates and times are to the days, dates and times of the Relevant Jurisdiction, unless otherwise indicated;

(v)   any reference to a code, law, statute, statutory provision, statutory instrument, order, regulation or other instrument of similar effect shall include any re-enactment or amendment thereof for the time being in force;

(vi)   understanding and interpretation of this Agreement shall be based on the purpose of this Agreement and the original meaning of the context and prevailing understanding and practice in the industry, and provisions of this Agreement and relevant Appendix(es) shall be understood and interpreted as a whole;

(vii)   any prices or fees set forth in this Agreement are not subject to turnover taxes including but limited to sales and use tax, valued added tax and any other governmental charges and duties similar to the turnover tax according to the State tax regulation of the relevant jurisdiction (i.e. State of South Carolina); and

(viii)   "$", "US$", "US dollar", "US dollars", "dollar" and "dollars" denote lawful currency of the United States of America.

## 2.   SCOPE OF SERVICES

Subject to the terms and conditions of this Agreement, Service Provider shall provide to BITMAIN, and BITMAIN shall receive from Service Provider, the Services agreed in each of the applicable Service Orders.

## 3.   HOSTING FEE AND PAYMENT

3.1.   Hosting Fee Calculation. Hosting Fee for each Billing Period shall be calculated as follows:

Hosting Fee = Power Consumption × Actual Hosting Unit Price

3.2.   Actual Hosting Unit Price Adjustment. Under each Service Order, the initial Actual Hosting Unit Price shall be the Normal Hosting Unit Price set forth in such Service Order, subject to the following adjustment for each Billing Period:

Doc ID: 598fea4325936dede54525103Sa16e788c661706

BITMAIN

v6.4.0

    (a)    *Downward Adjustment*. If the Hosting Fee Ratio for such Billing Period is higher than 90%, the Actual Hosting Unit Price applicable to such Billing Period shall be adjusted to the higher of:

        (i)    an amount equal to the result of (x) 80% of aggregate of the Theoretical Hashrate PPS Income during such Billing Period, divided by (y) Power Consumption of such Billing Period; or

        (ii)    the Minimum Hosting Unit Price.

    (b)    *Upward Restoration*. In the event that (x) the Actual Hosting Unit Price is lower than the Normal Hosting Unit Price, and (y) the Hosting Fee Ratio for such Billing Period is no higher than 60%, the Actual Hosting Unit Price applicable to such Billing Period shall be adjusted to the lower of:

        (i)    an amount equal to the result of (x) 80% of aggregate of the Theoretical Hashrate PPS Income during such Billing Period, divided by (y) Power Consumption of such Billing Period; or

        (ii)    the Normal Hosting Unit Price.

    (c)    In the event there are more two or more types of Hosted Server(s), the Hosting Fee Ratio and adjustment of Actual Hosting Unit Price for a Billing Period shall be calculated and applied respectively for each type of Hosted Server(s).

3.3.    <u>Other Fees</u>. Other fees set forth in the applicable Service Order shall be paid in accordance with such Service Order on a pay-per-use basis; provided that these fees may only be incurred after prior written approval of BITMAIN.

3.4.    <u>Deposit</u>.

    (a)    <u>Payment of Deposit</u>. For each batch of Hosted Servers under the applicable Service Order, BITMAIN shall pay to Service Provider the Deposit in accordance with paragraph 3.1 of such Service Order on or before the seventh (7th) Business Day from the date on which BITMAIN has been provided documentation that Service Provider has sufficient procurement that the Data Center Facility has satisfied the conditions of payment of Deposit set forth in EXHIBIT A of applicable Service Order, except as otherwise agreed by both Parties in the applicable Service Order.

    (b)    <u>Delayed Compensation</u>. The amount of the Delayed Compensation shall be calculated as follows:

**Delayed Compensation = $\sum$Rated Power of each delayed Hosted Server (kW) × US$0.01 × Number of delayed hours (any fractional delay of an hour shall be rounded up to next hour)**

Doc ID: 598fea432b908deda545251098a18e788c661706

BITMAIN

v6.4.0

(c)   Delay in Delivery of Hosted Servers. BITMAIN will deliver the respective batch of Hosted Servers to the Data Center Facility after the date on which BITMAIN has been provided documentation that Service Provider has sufficient procurement that Service Provider has completed the construction of the Data Center Facility and passed the inspection of the Data Center Facility by BITMAIN. Except as otherwise agreed by both Parties, in the event that BITMAIN fails to deliver the respective batch of Hosted Servers to the Data Center Facility on or before (x) the Initial Date, or (y) the estimated arrival date for the respective batch of Hosted Servers as set forth in paragraph 2.2 of the applicable Service Order, whichever is later:

(i)   Service Provider shall be entitled to deduct from the Deposit the corresponding Delayed Compensation in accordance with the corresponding number of hours and number of Hosted Servers delayed; and

(ii)   if BITMAIN fails to remedy such delay within thirty (30) calendar days, Service Provider shall be entitled to terminate this Agreement by notice with immediate effect. Service Provider shall unconditionally remit the difference between the Deposit which has been paid by BITMAIN and the deducted Delayed Compensation to BITMAIN within seven (7) Business Days from the termination of this Agreement, unless otherwise stipulated in the Agreement.

(d)   Delay in Power-On of Hosted Servers.

(i)   Except as otherwise agreed by both Parties, Service Provider shall, to the satisfaction of BITMAIN, connect (1) the Data Center Facility to electrical power, and (2) enable the Data Center Facility to reach its standard operational conditions for the respective batch of Hosted Servers on or before (x) the Initial Date, or (y) the estimated power-on date for each batch of Hosted Servers as set forth in paragraph 2.1 of the applicable Service Order, whichever is later.

(ii)   In the event that either of the conditions set forth in Article 3.4(d)(i) fails to be satisfied on time, Service Provider shall immediately be liable to pay to BITMAIN the corresponding Delayed Compensation in accordance with the corresponding number of hours and number of Hosted Servers delayed.

(iii)   In the event that either of the conditions set forth in Article 3.4(d)(i) fails to be satisfied for more than thirty (30) calendar days, BITMAIN shall be entitled to terminate this Agreement by notice with immediate effect. Service Provider shall unconditionally remit to BITMAIN the Deposit that has been paid by BITMAIN in full and all Delayed Compensation

Doc ID: 598fee432b508deda545251098a18e786a66170e

BITMAIN

v6.4.0

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

within seven (7) Business Days from the termination of this Agreement, unless otherwise stipulated in the Agreement.

(e)     In case of any adjustment of Deposit in accordance with Article 6.1(b) and/or Article 6.1(e), Service Provider shall return the respective difference between the pre-adjustment Deposit and the post-adjustment Deposit in full to BITMAIN in accordance with Article 6.1(b) and/or Article 6.1(e).

(f)     Unless otherwise stipulated in the Agreement, the Deposit that has been paid by BITMAIN and not yet returned in accordance with Article 6.1(b) and/or Article 6.1(e) shall be returned to BITMAIN in full unconditionally within seven (7) Business Days from the expiration or termination of this Agreement after deducting any payable Hosting Fees or compensation as follows, regardless of whether any disputes have occurred during the performance of this Agreement:

(i)     In the event the Hosted Servers have connected to electrical power fully or partially, Service Provider shall refund the remaining portion of the Deposit after deducting any payable and undisputed outstanding Hosting Fees and any amount of applicable Delayed Compensation (if any);

(ii)    In the event the Hosted Servers have not connected to electrical power, Service Provider shall refund the remaining portion of the Deposit after deducting any amount of applicable Delayed Compensation (if any).

3.5.    Prepayment of Hosting Fee. Prepayments of Hosting Fee shall be made by BITMAIN to Service Provider as follows:

(a)     Prepayment. Within seven (7) Business Days from the date on which BITMAIN has been provided documentation that Service Provider has sufficient procurement that the Data Center Facility has satisfied the conditions of Prepayment set forth in EXHIBIT A of applicable Service Order for the respective batch of Hosted Servers on or before (x) the Initial Date, or (y) the estimated power-on date for each batch of Hosted Servers as set forth in paragraph 2.1 of the applicable Service Order, or (z) in the event that Service Provider does not perform its obligations under Article 3.4(d)(i) on time, the seventh (7th) Business Day after Service Provider has provided BITMAIN with documentation certifying that it has completed its relevant obligations, whichever is later, BITMAIN shall pay a prepayment to Service Provider in the amount of one (1) month's Monthly Theoretical Hosting Fee calculated based on the actual quantity of such batch of Hosted Servers powered-on (the "**Prepayment**").

(b)     Return of Prepayment. Each Prepayment shall be used to offset the finally determined Hosting Fee of the corresponding batch of Hosted Servers for the first Billing Period and the subsequent Billing Periods (if there is any Balance) in accordance with Article 3.6. If there is any unused Prepayment at the

Doc ID: 598fea432b908deda545251098a18e788c661706



v6.4.0

expiration or termination of this Agreement, Service Provider shall unconditionally return such unused Prepayment in full to BITMAIN within seven (7) Business Days from the termination or expiration of this Agreement, regardless of whether any disputes have occurred during the Term of this Agreement.

3.6.    Invoice, Payment and Settlement Mechanism.

(a)    Invoice. Service Provider shall issue the invoice of the Hosting Fee for the previous Billing Period to BITMAIN within seven (7) Business Days from the end of such Billing Period, with (i) the Reconciliation Statement for such Billing Period; and (ii) the supporting documents proving the Power Consumption for the such Billing Period (including but not limited to, photos of the Separate Meter showing the Power Consumption at the end of such Billing Period, invoice of such Billing Period issued by the relevant power supplier to the Service Provider, and payment receipt indicating Service Provider made the due payment of such Billing Period to such power supplier) as attachments to the invoice.

(b)    Revision Against Objection and Payment. BITMAIN shall be entitled to raise to Service Provider any objection to an invoice (including its attachments) issued by Service Provider in accordance with Article 3.6(a) within five (5) Business Days upon receipt of such invoice:

(i)    Except as otherwise agreed by both Parties, in the event that BITMAIN raises no objection to an invoice or its attachments within the aforementioned period, it shall be deemed that BITMAIN has approved the invoice and BITMAIN shall pay to Service Provider the Hosting Fee in the invoice within seven (7) Business Days after BITMAIN's receipt of the invoice, subject to the Settlement Mechanism in accordance with Article 3.6(c).

(ii)    In the event that BITMAIN raises any objection to an invoice and/or its attachments within the aforementioned period, the Parties shall diligently and expeditiously cooperate to resolve the discrepancies based on the factors in disputes, such as, without limitation, Power Consumption, Hosting Fee Ratio and Actual Hosting Unit Price (including Actual Hosting Unit Price after adjustment as agreed in accordance with this Agreement, if applicable) within seven (7) Business Days upon BITMAIN's raising of objection (the "Confirmation Period"). Should the Parties successfully resolve all discrepancies within Confirmation Period, as extended by mutual agreement of both Parties (such agreed amount, the "Confirmed Hosting Fee"). BITMAIN shall pay the Service Provider the Hosting Fee in an amount equal to the Confirmed Hosting Fee within seven (7)

Doc ID: 593faa432b908daca545251098a18e788c661706

BITMAIN                                                          v6.4.0

Business Days after the agreement to the Confirmed Hosting Fee provided that Service Provider has issued an updated invoice to BITMAIN in an amount equal to such Confirmed Hosting Fee (if the Confirmed Hosting Fee differs from the Hosting Fee shown in the original invoice).

(iii)    In the event that the Parties are unable to resolve any objection to an invoice in accordance with Article 3.6(b)(ii) (such disputed invoice, the "**Disputed Hosting Fee**"), the Parties shall promptly refer the Disputed Hosting Fee along with all items and calculations therein to an impartial nationally recognized firm of independent chartered professional accountants appointed by mutual agreement of BITMAIN and the Service Provider (the "**Independent Accountant**"). The Independent Accountant shall be directed to render a written report on the Disputed Hosting Fee by confirming the calculations of the Power Consumption, Actual Unit Hosting Price, Delayed Compensation and Incentive Coupon (collectively, the "**Permitted Disputed Items**") as promptly as practicable but in no event greater than **thirty (30)** days after such submission to the Independent Accountant, and to resolve only those unresolved disputed items set forth in the objection of BITMAIN provided under Article 3.6(b)(ii) in accordance with the terms of this Agreement. If a Disputed Hosting Fee involves the resolution of any disputed items other than the Permitted Disputed Items, then such Disputed Hosting Fee shall not be eligible for resolution by the Independent Accountant and shall be resolved using the dispute resolution provisions within Article 16.4 hereof. If a Disputed Hosting Fee is submitted to the Independent Accountant, the Service Provider shall grant the Independent Accountant reasonable access, during regular business hours and on reasonable advance notice, to the Service Provider's books and records, personnel and facilities, and the Service Provider and BITMAIN shall each furnish to the Independent Accountant such work papers, schedules and other documents and information relating to the unresolved disputed items as the Independent Accountant may reasonably request. The Independent Accountant shall resolve the disputed items acting as an expert and not as an arbitrator based solely on the applicable definitions and other terms in this Agreement. The resolution of the disputed items and final determination of the Disputed Hosting Fee by the Independent Accountant shall be within the range of values assigned to each such item submitted by BITMAIN and the Service Provider and shall be final and binding on the Parties hereto absent manifest error. The fees and expenses of the Independent Accountant shall be borne by (i) BITMAIN on the one hand and the Service Provider on the other hand, in proportion to the amounts by which their respective calculations of the Disputed Hosting Fee differ

Doc ID: 598fea432b908deda545251098a18e788c661706

BITMAIN                                                                    v6.4.0

from the Hosting Fee as finally determined by the Independent Accountant.

For avoidance of doubt, the Parties agree that Service Provider shall not suspend provision of Services or terminate this Agreement or any Service Order for failure of BITMAIN to make payment before the Hosting Fee (including the Confirmed Hosting Fee and/or the Disputed Hosting Fee) has been finally determined and due in accordance with this Article 3.6(b). If BITMAIN fails to make payment when the Hosting Fee (including the Confirmed Hosting Fee and/or the Disputed Hosting Fee) has been finally determined and due within sixty (60) calendar days, Service Provider shall be entitled to terminate this Agreement by notice with immediate effect.

(c)     Settlement Mechanism. The Disputed Hosting Fee for each Billing Period shall be settled in accordance with the following mechanism:

For the First Billing Period:

(i)     if the amount of Hosting Fee in the invoice equals to the Prepayment provided in accordance with Article 3.5, the Hosting Fee in the invoice shall be deemed as fully settled on the date of the invoice;

(ii)    if the amount of Hosting Fee in the invoice is less than the Prepayment provided in accordance with Article 3.5, the Hosting Fee in the invoice shall be deemed as fully settled on the date of the invoice and the portion of the difference between the Prepayment and the Hosting Fee (the "Balance") shall be used to offset the Hosting Fee in the subsequent invoice(s); and

(iii)   if the amount of the Hosting Fee in the invoice is more than the Prepayment provided in accordance with Article 3.5, BITMAIN shall pay to Service Provider the difference between the Prepayment and the amount of Hosting Fee in the invoice on or before the Hosting Fee is due in accordance with Article 3.6(b) and the Hosting Fee in the invoice shall be deemed as fully settled upon BITMAIN's payment of such difference.

For the Subsequent Billing Periods:

(iv)    BITMAIN shall pay the amount of the Hosting Fee in the invoice after deducting the Balance (if any) on or before the Hosting Fee is due in accordance with Article 3.6(b).

3.7.    Confirmation of Hosted Servers Security. Notwithstanding the foregoing, Service Provider shall issue a Confirmation of Hosted Servers' Security (in the form as attached in APPENDIX III hereto) of providing Hosted Servers' latest information, and the

Doc ID: 598fea432b968deda545251098a18e786c681706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

BITMAIN                                                                    v6.4.0

current business operation of Service Provider within not more than seven (7) Business Days before the due date of each of BITMAIN's payments hereunder, otherwise BITMAIN is entitled to postpone any payments until such confirmation is provided.

3.8. <u>Payment Method of Hosting Fee</u>. All payment of Hosting Fee pursuant to this Agreement, including any remittance or refund of Hosting Fee, shall be made in accordance with paragraph 4.2 of the applicable Service Order.

3.9. <u>Incentive Coupon</u>. BITMAIN shall provide a coupon ("**Incentive Coupon**") to Service Provider in an amount equal to 5% of the Hosting Fee of such two consecutive Billing Periods, in the event that Online Status Ratio of such two consecutive Billing Periods is no less than 98%. For the purpose of this Article 3.9, the Online Status Ratio shall be calculated strictly in accordance with the formula as forth herein without consideration for technical failures or any power outage due to any reasons, including but not limited to any event of Force Majeure, technical failure or severe weather.

3.10. <u>Increased Cost</u>. If there are any increases, changes in, or introduction or administration of, any new taxes, levies, tariffs, utility cost increase, governmental fees or charges with respect to the provision of Services or the operation of the Data Center Facility, Service Provider shall not pass through any of such amounts to BITMAIN. The Parties shall solely apply Article 3.2 or Article 6.9(c) or other applicable provisions under this Agreement to adjust the Hosting Fee.

3.11. <u>Set-off</u>. BITMAIN may set-off and deduct for any amounts payable under this Agreement to Service Provider any amounts owing by Service Provider to BITMAIN pursuant to this Agreement.

**4.    REPRESENTATIONS AND WARRANTIES**

4.1.    Each of the Parties hereby makes the following representations and warranties to the other Party:

(a)    It has the full power and authority to own its assets and carry on its businesses.

(b)    The obligations expressed to be assumed by it under this Agreement are legal, valid, binding and enforceable obligations.

(c)    It has the power to enter into, perform and deliver, and has taken all necessary action to authorize its entry into, performance and delivery of, this Agreement and the transactions contemplated by this Agreement.

(d)    The entry into and performance by it of, and the transactions contemplated by, this Agreement do not and will not conflict with:

(i)    any Applicable Law;

(ii)    its constitutional documents; or

Doc ID. 598fea432b908deda545251098a18e788c661706



v6.4.0

         (iii)    any agreement or instrument binding upon it or any of its assets.

    (e)    All authorizations required or desirable:

         (i)    to enable it to lawfully enter into, exercise its rights under and comply with its obligations under this Agreement;

         (ii)    to ensure that those obligations are legal, valid, binding and enforceable; and

         (iii)    to make this Agreement admissible in evidence in its jurisdiction of organization,

have been, or will have been by the time, obtained or effected and are, or will be by the appropriate time be, in full force and effect.

    (f)    It is not aware of any circumstances which are likely to lead to:

         (i)    any authorization obtained or effected not remaining in full force and effect;

         (ii)    any authorization not being obtained, renewed or effected when required or desirable; or

         (iii)    any authorization being subject to a condition or requirement which it does not reasonably expect to satisfy or the compliance with which has or could reasonably be expected to have a material adverse effect.

4.2.    Service Provider hereby makes the following representations and warranties to BITMAIN:

    (a)    It has provided BITMAIN with all the information and materials of which it has Knowledge in accordance with BITMAIN's due diligence checklist. No information or materials provided by it in the due diligence process, when taken as a whole, contains any untrue statement or omits to state any material fact. There is no information that Service Provider has not disclosed to BITMAIN in response to BITMAIN's inquiry, of which any of Service Provider's Representatives has Knowledge.

    (b)    The Services shall be free from defects and shall meet the specifications as stipulated herein (including but not limited to provisions of Article 6). Without prejudice to BITMAIN's other rights, in the event of any breach of this warranty, Service Provider shall make prompt payment of the fair market value for such Hosted Servers to BITMAIN if the Hosted Servers are damaged, lost or have other abnormalities due to reasons attributable to Service Provider.

Doc ID: 598fee432b9c6dada54525f093a18e788c661706



BITMAIN                                                                                    v6.4.0

(c)   Service Provider represents and warrants that the entry into and performance by it of, and the transactions contemplated by, this Agreement does not conflict with the lease agreement between itself and the relevant landlord in connection with the Data Center Facility. The Service Provider further represents and warrants that this Agreement is permitted under the use of the related premises. BITMAIN shall not in any event be liable for any obligations to the landlord of the Data Center Facility (the "**Landlord**"), including but not limited to rental or any other fees payable by the Service Provider to the Landlord.

(d)   At all times, rights, title and interest in the Hosted Servers shall remain absolutely with BITMAIN or the owner of the Hosted Servers, and the Hosted Servers shall be identifiable and separate from the Service Provider's own assets. For the avoidance of doubt, any claim over the Service Provider in an event of default relating to the Service Provider shall exclude the Hosted Servers.

## 5.    VOLUNTARY POWER-OFF AND LOW POWER MODE

5.1.   In the event that the Actual Hosting Unit Price for any Billing Period has been adjusted to the Minimum Hosting Unit Price in accordance with Article 3.2, and the Hosting Fee Ratio has remained at 90% or higher for a consecutive of $24*14$ hours in the subsequent Billing Period, BITMAIN shall be entitled to voluntarily power off any or all of the Hosted Servers in its sole discretion or to have them operate in Low Power Mode to reduce the Power Consumption.

5.2.   Any Power-off Server may remain on rack at the Data Center Facility for a period of fourteen (14) calendar days (exclusive of the first day on which such Power-off Server is powered off, the "**Voluntary Power-off Period**"), during which period BITMAIN shall be entitled to re-power on such Hosted Server in its sole discretion at any time. At the expiration of the Voluntary Power-off Period, the Parties shall negotiate in good faith to mitigate losses to the utmost extent.

5.3.   During the Voluntary Power-off Period:

Service Provider may request BITMAIN to continue operating certain number of Power-off Servers that total Power Consumption of which shall not exceed the Minimum Power Commitment, and all the earning of such Hosted Servers shall solely owned by BITMAIN. In the event the Hosting Fees during such period exceed the amount of earnings, Service Provider shall compensate BITMAIN for the differences between such amount of earnings and Hosting Fees.

## 6.    OPERATION ENVIRONMENT OF DATA CENTER FACILITY

6.1.   <u>Conditions of the Data Center Facility</u>. No later than the Initial Date and at all times up to and until the termination of this Agreement, Service Provider shall provide BITMAIN with sufficient server rooms, server positions, racks, power load and facilities, broadband network and network facilities, heat dissipation facilities, sand,

Doc ID: 598fea432b908deda545251098a18e788c661706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249



BITMAIN                                                                    v6.i.0

rain and snow-proofing facilities, temperature and humidity monitoring and sensing equipment, security monitoring and other equipment reasonably required for the normal operation of the Hosted Servers of the reasonable commercial standard, satisfying at least the following requirements:

(a)    There shall be at least two operators' dedicated network line access, network bandwidth configuration of 100Mbps per 10,000 miners, and network latency of no more than 100ms (based on the ping value from the Hosted Servers' intranet IP to ANTPOOL). Besides, a network environment containing RJ45 interfaces shall be provided for the Monitoring Software's servers in the Data Center Facility's operation and maintenance network;

(b)    The temperature of the air inlet of any Hosted Server at any time shall not be higher than 35°C or lower than 5°C. If the temperature conditions (especially high-temperature conditions) of the Data Center Facility are not satisfied, BITMAIN shall be entitled to reduce the Hosting Quantity of Hosted Servers to satisfy the heat dissipation requirements of the miners at its sole discretion, and Service Provider shall (i) unconditionally cooperate with BITMAIN to move the de-racked Hosted Servers due to temperature reasons designated by BITMAIN out of the server room, and (ii) adjust the amount of the Deposit in accordance with the reduced Hosting Quantity and return the difference between the pre-adjustment Deposit and the post-adjustment Deposit in full to BITMAIN within seven (7) Business Days from reduction of the Hosting Quantity;

(c)    The environmental humidity of the Data Center Facility at any time shall not be higher than 75% or lower than 10%;

(d)    The measurement range of the temperature and humidity monitoring and sensing equipment shall cover -30°C to 60°C. Temperature and humidity monitoring and sensing equipment may be wired transmission equipment or wireless transmission equipment, for the convenience of operation and maintenance real-time monitoring;

(e)    The power load provided by Service Provider shall satisfy the requirements of this Agreement, the Service Orders and standard operational conditions. In the event that the power load is insufficient for any reason (including but not limited to damage to power supply equipment, insufficient supply from the power supplier, or policy changes at the location of the Data Center Facility), BITMAIN shall be entitled to reduce the Hosting Quantity of the Hosted Servers at its sole discretion, and Service Provider shall (i) unconditionally cooperate with BITMAIN to move the de-racked Hosted Servers due to insufficient power load designated by BITMAIN out of the server room, and (ii) adjust the amount of the Deposit in accordance with the reduced Hosting Quantity and return the difference between the pre-adjustment Deposit and the post-adjustment Deposit

Doc ID: 593fea432b908ceda54525c098a18e788c661706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

# BITMAIN

v6.4.0

in full to BITMAIN within seven (7) Business Days from reduction of the Hosting Quantity; and

(f)     There shall be sufficient forklifts, lift trucks and other related machinery and equipment to provide timely racking and de-racking services for the Hosted Servers.

6.2.    <u>Exclusive Server Room</u>. Service Provider shall provide exclusive server room(s) for the storage and operation of the Hosted Servers, which shall be physically separated from server rooms at the Data Center Facility for use by other customers of Service Provider. No server and/or other hardware equipment other than the Hosted Servers may be allowed in such exclusive server room(s) unless with prior written approval of BITMAIN. Service Provider shall take necessary measures satisfactory to BITMAIN to separate the Hosted Servers from other servers and/or hardware equipment, including but not limited to labeling the Hosted Servers. Besides, Service Provider shall provide room, network and power supply for the Monitoring Software, separate from the Hosted Servers.

6.3.    <u>Standard Hosting Environment</u>. Service Provider shall maintain the standard hosting environment for the Hosted Servers in accordance with the conditions set forth in the applicable Service Order.

6.4.    <u>Title and Ownership</u>. Service Provider warrants and represents that it has good title to, or right by license, lease or other agreement to use, the Data Center Facility, and there is no actual, pending or threatened dispute or other claim as to title and ownership of the Data Center Facility.

6.5.    <u>Safety and Security</u>. Server Provider shall take standard industry practices and all necessary measures, as well as install all necessary facilities, to ensure safety and security of the Data Center Facility and the Hosted Servers against any safety accidents such as damage, loss or fire outbreak, etc. or any faults such as dust ingress, water ingress or snow ingress, etc. If any Hosted Server is damaged, lost or has other abnormalities due to reasons attributable to Service Provider, Service Provider shall indemnify BITMAIN against its losses arising therefrom based on the fair market value of such Hosted Server.

6.6.    <u>Compliance with Applicable Law</u>. Service Provider shall ensure that the operation of the Data Center Facility, the individuals of Service Provider and provision of Services is at all times in compliance with Applicable Laws and that any and all applicable approvals, certificates, orders, authorizations, permits, qualifications and consents required for the operation of the Data Center Facility and provision of Services have been obtained no later than the Initial Date and are not revoked, cancelled or expired (unless properly renewed on or prior to such expiration) up to and until the termination of this Agreement. The Parties recognize that it is Service Provider's sole and exclusive responsibility to maintain a safe and healthy work environment at the Data Center Facility that is free from recognized hazards and fully complies with the Applicable

Doc ID: 598fea432b908deda545251098a18e788c661706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

BITMAIN                                                                           v6.4.0

Laws, including without limitation, the federal Occupational Safety and Health Act ("OSHA", if applicable), as well as any similar state or local laws. Accordingly, Service Provider promises and hereby covenants to maintain a safe and healthy work environment at the work places including but not limited to the Data Center Facility and the necessary onsite production and living facilities including office rooms, maintenance rooms, canteen, dormitory and toilets, that is free from recognized hazards and fully compliant with OSHA (if applicable), and any similar state or local laws, to ensure the safety of BITMAIN Personal (as defined below) during their work. Besides, Service Provider shall organize necessary safety training and safety drills for BITMAIN Personal on a regular basis.

6.7. <u>24/7 Access by BITMAIN Personnel</u>. If there is no other specific agreement, BITMAIN or the third party designated by BITMAIN (collectively, the "**O&M Service Provider**") shall be responsible for the operation and maintenance of the Hosted Servers. The O&M Service Provider may appoint one or more individuals ("**BITMAIN Personnel**") to carry out operation and maintenance activities on the Hosted Servers onsite at the Data Center Facility on a 24-hour per day, 7-day per week basis. Service Provider shall provide all necessary support and cooperation for the operation and maintenance of the Hosted Servers by BITMAIN Personnel, including but not limited to that Service Provider shall grant BITMAIN Personnel access and permit to:

(a)    enter into the Data Center Facility;

(b)    obtain the operational data of the Hosted Servers;

(c)    inspect the operational conditions of the Data Center Facility;

(d)    perform maintenance on the Hosted Servers;

(e)    handle or repair any Hosted Servers that may be damaged, defective, malfunctioning or not operating; and

(f)    check, examine and conduct inventory audits of the Hosted Servers and Inventory Assets.

6.8. <u>Test Site</u>. Service Provider shall provide BITMAIN Personnel with proper test site for operation and maintenance of the Hosted Servers that meets the safety and security requirements. The test site shall provide 220V power supply and necessary network access, and shall have no less than 5 power outlets and 5 network interfaces unless otherwise required by BITMAIN Personnel.

6.9. <u>Online Status Ratio</u>.

(a)    Subject to the Actual Hosting Unit Price adjustment in accordance with Article 3.2, Service Provider shall ensure that the Online Status Ratio in each Billing Period is no less than 95%, unless such below-95% Online Status Ratio is

Doc ID  598fea432b908deda545251096a18e768c661706

BITMAIN

v6.4.0

caused solely by the defects of the Hosted Servers or the inappropriate operation of the Hosted Servers by BITMAIN Personnel.

(b)   If the Online Status Ratio for any Billing Period is less than 95% due to any substandard condition of the Data Center Facility, including but not limited to, power connection, network connection, heat dissipation, water purification and/or other infrastructure, Service Provider shall have a period of one (1) month to remedy such substandard condition.

(c)   If the Online Status Ratio for the Billing Period immediately after the one-month remedial period continues to be less than 95%, BITMAIN shall be entitled to (i) terminate this Agreement with immediate effect without any liability for breach of contract, or (ii) a further reduction of the Actual Hosting Unit Price so that the Actual Hosting Unit Price for such Billing Period shall be the product of the current Actual Hosting Unit Price which has been adjusted pursuant to Article 3.2 multiplied by the Online Status Ratio immediately after the one-month remedial period with effect from the expiration of the remedial period up to and until the Online Status Ratio for a Billing Period is no less than 95%.

6.10.   Inventory Storage. In addition to the space required for hosting of the Hosted Servers, Service Provider shall provide sufficient space to BITMAIN for storage and safe-keeping of Inventory Assets.

6.11.   Installation and Accuracy of Separate Meter. Service Provider shall install Separate Meter(s) at the Data Center Facility to monitor the electrical power consumed by the Hosted Servers, and shall cooperate with BITMAIN to check and calibrate the accuracy of the Separate Meter(s) regularly or occasionally in accordance with BITMAIN's request and instructions, to ensure the constant accuracy of the Separate Meter(s).

6.12.   Inventory Audit. BITMAIN shall be entitled to conduct inventory audits of the Hosted Servers regularly or occasionally, and Service Provider shall provide assistance and convenience accordingly. If the result of the inventory audit does not match the information as stipulated in the applicable Service Order, Service Provider shall assist BITMAIN to discover the reasons. If any Hosted Server is lost, Service Provider shall indemnify BITMAIN against its losses arising therefrom based on the fair market value of such Hosted Server.

7.   **INSURANCE**

7.1.   BITMAIN may keep, or procure the owner of the Hosted Servers (as applicable) to keep, in full force and effect during the Term of this Agreement appropriate commercial general liability insurance and property insurance covering the Hosted Servers, at the expense of the applicable owner of the Hosted Servers.

Doc ID: 598fea432b908deda545251098a18e788c661706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

# BITMAN

v6.4.0

7.2.    In the event of any damage or loss of the Hosted Servers and upon request of BITMAIN, Service Provider shall provide BITMAIN and/or the owner of the Hosted Servers (as applicable) with documents and information in support of the insurance claim made to the insurance company.

7.3.    In the event of any damage or loss of the Hosted Servers caused by or results from the negligence or willful misconduct of Service Provider and that the insurance is unavailable or insufficient to cover the losses of BITMAIN and/or the owner of the Hosted Servers (as applicable), Service Provider shall be liable to indemnify BITMAIN (for and on behalf of the owner of the Hosted Servers, as applicable) for the difference between the insurance coverage, if any, and such losses.

## 8.    TITLE AND OWNERSHIP OF HOSTED SERVERS

8.1.    Ownership of Hosted Servers. Subject to Articles 8.2 and 8.3, Service Provider acknowledges and agrees that the Hosted Servers and Inventory Assets are assets of BITMAIN or any third party designated by BITMAIN (as applicable) (collectively, the "**Owner of Hosted Servers**") and the Owner of Hosted Servers shall solely have the proprietary interest in the Hosted Servers. The Owner of Hosted Servers' such interest shall not be affected by any factors, including but not limited to Service Provider's operating conditions, financial conditions or any disputes or lawsuits against its shareholders or any third parties. In no event shall Service Provider's creditors, shareholders or other third parties be entitled to file disputes regarding the ownership of the Owner of Hosted Servers. Without prejudice to the foregoing, in the event that any such dispute occurs, Service Provider shall provide the Owner of Hosted Servers with all reasonable assistance in proving the Owner of Hosted Servers' proprietary interest in the Hosted Servers.

8.2.    Priority Right. In the event that the Owner of Hosted Servers proposes to dispose of any Hosted Server that is owned by such Owner of Hosted Servers (the "Offered Server"), the Owner of Hosted Servers shall give Service Provider notice (the "Disposal Notice") of such proposed disposal at least seven (7) days prior to the proposed disposal, and Service Provider shall be entitled to purchase such Offered Server(s) at the price and on the terms specified in the Disposal Notice. If Service Provider waives such priority right, fails to respond to the Disposal Notice, or fails to execute the purchase agreement of the Offered Server(s) within seven (7) days since the date of the Disposal Notice, the Owner of Hosted Servers shall be entitled to dispose the Offered Server(s) to any third party without any limitation.

8.3.    Transfer of Rights. Subject to Article 8.2, if the Owner of Hosted Servers transfers all or part of the Offered Server(s) to a third party, BITMAIN shall be entitled to transfer its rights and obligations with regard to the Services hereunder associated with such Offered Server(s) hereunder to such third-party purchaser, and Service Provider shall provide corresponding assistance and execute the relevant documents in this regard.

## 9.    INDEMNIFICATION

Doc ID: 593fea432b908dedea545251088a18e788c661708

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

# BITMAIN

v6.4.0

9.1.　Service Provider shall indemnify, defend, and hold BITMAIN and its Affiliates, and its and their officers, directors, agents, and employees, harmless from and against any third-party action, claim, suit, proceeding, demand, investigation, or charge alleging any costs, losses, liabilities, damages, fines, judgments, fees, or expenses (including reasonable attorneys' fees and court costs) directly or indirectly, as a result of, or based upon or arising out of: (i) Service Provider's performance of the Services hereunder; (ii) any failure to comply with Applicable Law in connection with the Services or this Agreement; (iii) any liability or damage incurred by reason of any act or omission of Service Provider; or (iv) facts, which if true, would constitute a breach of any of Service Provider representations, warranties, or covenants hereunder, including, but not limited to, Service Provider fails to provide Services required by BITMAIN in accordance with this Agreement, such as frequent power outages at the Data Center Facility, Data Center Facility being shut down or being required to make improvements by competent authorities, etc., which prevents Hosted Servers from being in a stable Online Status. Should (1) in the event that BITMAIN asserts claim(s) against Service Provider, Service Provider fails to respond to the claim and take remedial action satisfactory to BITMAIN within ten (10) days following receipt of written notice thereof from BITMAIN; or (2) in the event that any third party asserts claim(s) against Service Provider and/or BITMAIN, Service Provider fails to use counsel reasonably acceptable to BITMAIN within ten (10) days following receipt of written notice thereof from BITMAIN, BITMAIN shall be entitled to terminate this Agreement by written notice with immediate effect and control the defense and settlement of any such claim using counsel of its own choice with Service Provider bearing the costs and expenses of such representation (if applicable). Service Provider may not settle any action, claim, suit, proceeding, demand, investigation, or charge under this Article 9.1 without BITMAIN's prior written consent. For avoidance of doubt, BITMAIN shall be entitled to participate in any defense using its own counsel at its own cost.

9.2.　Subject to other provisions of this Article 9, each Party hereby agrees to indemnify, defend and hold harmless the other Party and its respective Affiliates, officers, directors, agents and employees from and against any and all losses, liabilities, liens, claims, obligations, judgments, penalties, deficiencies, costs and expenses (including reasonable attorneys' fees and court costs) resulting from or arising out of any breach or omission of performance by such Party of any of the representations, covenants or other agreements in this Agreement.

## 10.　FORCE MAJEURE

10.1.　A Party shall not be considered to be in default or breach of this Agreement and shall be excused from performance or liability for damages to the other Party, if and to the extent that the performance of any obligation of such Party under this Agreement (other than an obligation to make payment) is prevented, frustrated, hindered or delayed as a consequence of an event of Force Majeure, *provided* that:

Doc ID: 598fea432b908deda545251098a18e788c661706

BITMAIN                                                         v6.4.0

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

(a)  such Party claiming to benefit under this Article 10.1 (the "**Affected Party**") shall:

(i)  immediately and in any event no later than 24 hours from the occurrence of such event of Force Majeure, give the other Party (the "**Non-Affected Party**") a written notice (including via email) setting out details of such event of Force Majeure; and

(ii)  within three (3) days from the occurrence of such event of Force Majeure, produce to the Non-Affected Party supporting materials evidencing such event of Force Majeure and how its occurrence prevented, frustrated, hindered or delayed the performance of the Affected Party's obligation under this Agreement;

(b)  the Affected Party shall take all necessary measures to mitigate the impact of such event of Force Majeure and shall resume normal performance of this Agreement promptly after the removal of such event of Force Majeure, unless it is impracticable or unnecessary to resume the performance of this Agreement; and

(c)  Notwithstanding any other agreement to the contrary in this Agreement, Service Provider shall unconditionally waive BITMAIN's Hosting Fees for the duration of the Hosted Servers' inoperability due to the effects of such Force Majeure event.

10.2.  If the normal performance of this Agreement cannot be resumed within fourteen (14) calendar days from the occurrence of such event of Force Majeure, BITMAIN shall be entitled to terminate this Agreement with immediate effect without any liability for breach of contract.

11.  **TERM AND TERMINATION**

11.1.  Term. This Agreement shall have a term effective from the date hereof (i.e., August 5, 2023) (the "**Effective Date**") and expiring on the second (2nd) anniversary of the Initial Date (i.e., September 30, 2025) (the "**Term**").

11.2.  Termination. This Agreement may be terminated prior to the expiration of the Term:

(a)  upon mutual agreement in writing of the Parties;

(b)  upon either Party giving a written notice to the other Party if such other Party (i) files in any court or agency pursuant to any Applicable Law, a petition in bankruptcy or insolvency or for reorganization or for an arrangement or for the appointment of a receiver or trustee of such other Party or of its assets, (b) is served with an involuntary petition against it, filed in any insolvency proceeding that is not dismissed within ninety (90) days after the filing thereof, (c) makes an assignment of the assets associated with this Agreement for the benefit of its

Doc ID: 598fea432b908deda54525f098a18e788c561706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

BITMAIN                                                                    v6.4.0

creditors, (d) fails to maintain or renew any material business registration license, approval or permit that is required under any Applicable Law to carry out its normal business, (e) is subject to actual or potential liquidation, winding up, or dissolution, or (f) authorizes or consummates the merger, acquisition, reorganization, consolidation, business combination or similar transaction, or any transaction or series of transactions in which in excess of 50% of such other Party's voting power is transferred;

(c)    upon Service Provider giving a written notice to BITMAIN to terminate pursuant to Article 3.4(c)(ii) or other applicable articles if the situation has not been improved after negotiation between the Parties, and a compensation in an amount equal to Monthly Theoretical Hosting Fee shall be paid by BITMAIN to Service Provider upon termination;

(d)    upon BITMAIN giving a written notice to Service Provider to terminate pursuant to Article 3.4(d)(iii), Article 6.9(c), Article 9.1, Article 15.3 or other applicable articles if the situation has not been improved after negotiation between the Parties, and a compensation in an amount equal to Monthly Theoretical Hosting Fee shall be paid by Service Provider to BITMAIN upon termination;

(e)    upon either Party giving a written notice of its intention to terminate this Agreement in whole or in part of no less than sixty (60) calendar days to the other Party, *provided that* a compensation in an amount equal to Monthly Theoretical Hosting Fee shall be paid by this Party to such other Party upon termination and the termination shall be effective only to the extent of such notice; and

(f)    upon BITMAIN giving a written notice to Service Provider to terminate pursuant to Article 10.2.

11.3.    Effects of Termination. Upon termination of this Agreement:

(a)    Service Provider shall:

(i)    return the remaining Deposit to BITMAIN including in accordance with Articles 3.4(c)(ii), 3.4(d)(iii) 3.4(f);

(ii)    pay any and all amounts owing to BITMAIN including any Delayed Compensation under Articles 3.4(d)(iii) and 3.5(b), and Monthly Theoretical Hosting Fee under Articles 11.2(d) or 11.2(e);

(iii)    any Balance remaining;

(iv)    provide unfettered access to BITMAIN Personnel to the Data Center Facility and any assistance required by such BITMAIN Personnel to remove the BITMAIN Property;

Doc ID: 598fea432b908deda545251098a18e788c661706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249



v6.3.0

(v)   issue a final invoice with the applicable Hosting Fee outstanding up to the termination date in accordance with Article 3.6(a); and

(vi)  return all Confidential Information of BITMAIN to BITMAIN and delete all electronic copies thereof from its systems.

(b)  BITMAIN shall:

(i)   pay all finally determined invoice amounts outstanding as of the termination date;

(ii)  remove all the Hosted Servers and Inventory Assets from the Data Center Facilities; and

(iii) return all Confidential Information of Service Provider to Service Provider and delete all electronic copies thereof from its systems.

11.4.  Survival.

(a)  Neither the expiration nor the termination of this Agreement will release either of the Parties from any obligation or liability that accrued prior to such expiration or termination.

(b)  The provisions of this Agreement requiring performance or fulfillment after the expiration or termination of this Agreement will survive the expiration or termination of this Agreement including Article 8, Article 9, Article 11, Article 12, Article 13, Article 14 and Article 16 and such other provisions as are necessary for the interpretation thereof and any other provisions hereof, the nature and intent of which is to survive termination or expiration of this Agreement.

## 12.  CONFIDENTIALITY

12.1.  From the date of this Agreement until the fifth (5th) year anniversary of the expiration of the Term or the earlier termination pursuant to Article 11.2, each Party hereby agrees that it will, and will cause its Affiliates and its and their respective directors, officers, employees, professional advisors, agents and other Persons acting on their behalf (collectively, "Representatives") to hold, in strict confidence the terms and conditions of this Agreement, all exhibits and schedules attached hereto and the Service Order(s), including their existence, and all non-public records, books, contracts, instruments, computer data and other data and information, whether in written, verbal, graphic, electronic or any other form, provided by any other Party and its Representatives (except to the extent that such information has been (a) already in such Party's possession prior to the disclosure or obtained by such Party from a source other than any other Party or its Representatives, provided that, to such Party's knowledge, such source is not prohibited from disclosing such information to such Party or its Representatives by a contractual, legal or fiduciary obligation to any other Party or its

Doc ID: 598fea432b908dcda545251098a18c788c661706

BITMAIN                                                                    v6.4.0

Representatives, (b) in the public domain through no breach of the confidentiality obligations under this Agreement by such Party, or (c) independently developed by such Party or on its behalf without reference to any such non-public information) (the "**Confidential Information**").

12.2.   Notwithstanding the foregoing, each Party may disclose the Confidential Information (i) to its Affiliates and its and their respective Representatives so long as such persons are subject to appropriate nondisclosure obligations, (ii) as required by applicable Law (including securities Laws and applicable securities exchanges rules) or requests or requirements from any Governmental Authority or other applicable judicial or Governmental Order, or (iii) in connection with any enforcement of, or dispute with respect to or arising out of, this Agreement, or (iv) with the prior written consent of the other Party.

12.3.   The content of this Agreement and any information disclosed hereunder by the other Party in the course of negotiating or performing this Agreement is Confidential Information under this Agreement and shall only be used in accordance with this Agreement.

**13.     INJUNCTIVE RELIEF**

13.1.   Service Provider acknowledge that a breach or threatened breach of this Agreement shall cause serious and irreparable harm to BITMAIN for which monetary damages alone would not be a sufficient remedy. Accordingly, Service Provider agrees that in the event of a breach or threatened breach by the Service Provider, BITMAIN shall be entitled to injunctive relief and specific performance in addition to any other remedy available to BITMAIN in equity or at law without the necessity of obtaining any form of bond or undertaking whatsoever, and Service Provider hereby waives any claim or defense that damages may be adequate or ascertainable or otherwise preclude injunctive relief.

**14.     NOTICES**

14.1.   All notices, requirements, requests, claims, and other communications in relation to this Agreement shall be in writing, and shall be given or made by delivery in person, by an internationally recognized overnight courier service, by registered or certified mail (postage prepaid, return receipt requested) or electronic mail to the respective Parties at the addresses specified below or at such other address for a Party as may be specified in a notice given in accordance with this Article 14.1. Any such notice or other communication shall be deemed to have been given and received on the day on which it was delivered or transmitted (or, if such day is not a Business Day, on the next following Business Day).

14.2.   The following are the initial address of each Party:

**If to Service Provider:**

Doc ID: 598fea432b908deda545251098a18e788c661706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249



v6.4.0

| | |
|---|---|
| Address: | 215 East Bay St, Suite 201K #1712, Charleston, South Carolina 29401 |
| Attn: | Bennettech LLC |
| Email: | Bennettechllc1@gmail.com |

**If to BITMAIN:**

| | |
|---|---|
| Address: | 900 Old Roswell Lakes Parkway, Suite 310, Roswell, GA 30076, USA |
| Attn: | Legal Department |
| Email: | legal@bitmain.com |

**15.    ANTI-COMMERCIAL BRIBERY**

15.1.   Service Provider shall not, and shall procure its directors, officers, employees, consultants, agents and other representatives (collectively with Service Provider, the "**Service Provider Associates**") not to, directly or indirectly engage in any activity of commercial bribery, i.e. providing any unjustified interests in any form including but not limited to cash, cheque, credit card gifts, negotiable securities (including bonds and stocks), physical objects (including all kinds of high-end household goods, luxury consumer goods, handicrafts and collections, as well as housing, vehicles and other commodities), entertainment coupon, membership card, currency or rebate in the form of goods, kickback, non-property interests such as schooling, honor, special treatment, and employment for relatives and friends, traveling, entertaining and personal service etc. to any director, officer, employee, consultant, agent and other representative of BITMAIN (collectively, "**BITMAIN Associates**")in order to obtain the any immediate or future business opportunity with BITMAIN whether under this Agreement or any other business relationship, regardless of whether such unjustified interests is provided on Service Provider Associates' own initiative or in response to explicit or implicit request of BITMAIN Associates.

15.2.   If any of BITMAIN Associates explicitly or implicitly requests commercial bribes, Service Provider shall immediately notify BITMAIN of such activity with relevant evidence and cooperate with BITMAIN in its investigation.

15.3.   If any of Service Provider Associates commits commercial bribes in contravention of Article 15.1, BITMAIN shall be entitled to terminate this Agreement and any other existing business cooperation with Service Provider and claim for damages against Service Provider.

**16.    GENERAL**

16.1.   Entire Agreement and Amendment. This Agreement, together with all Services Orders, appendixes, schedules, annexes and exhibits, constitute the full and entire understating and agreement between the Parties, and supersede all other agreements between or

Doc ID: 595fea432b908deda545251098a18e786c661706



v6.4.0

among any of the Parties with respect to the subject matters hereof and thereof. This Agreement may only be amended with the written consent of both Parties or otherwise as mutually agreed by both Parties.

16.2. <u>Assignment</u>.

    (a)    BITMAIN may freely assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part to its Affiliates or to any third party; provided that, in the event of assigning or transferring to a third party, Service Provider may conduct a background check of the third party to mitigate potential legal or credit risks.

    (b)    Service Provider may assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part subject to BITMAIN's prior written consent.

    (c)    This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

16.3. <u>Non-Solicitation</u>. Service Provider agrees that from the date of this Agreement until the first (1st) year anniversary of the expiration of the Term or the earlier termination pursuant to Article 11.2, unless mutually agreed by both Parties, Service Provider shall not (1) directly or indirectly, solicit, recruit, encourage or induce employees or consultants of BITMAIN to (i) terminate such person's employment or consulting relationship with BITMAIN or (ii) become employed or engaged as an employee, officer, director, member, manager, partner or any other type of Service Provider for the employee or any other third party; or (2) use any Confidential Information, directly or indirectly, to solicit customers or suppliers of BITMAIN or otherwise divert or attempt to divert business away from BITMAIN, nor will the employee encourage or assist others to do.

16.4. <u>Governing Law</u>. This Agreement shall be solely governed by and construed in accordance with the laws of the Relevant Jurisdiction, without regard to principles of conflict of laws.

16.5. <u>Dispute Resolution</u>. All disputes arising under this Agreement shall be submitted to arbitration in Houston, Texas before a single arbitrator of the American Arbitration Association ("AAA"). The arbitrator shall be selected by application of the rules of the AAA, or by mutual agreement of the parties, except that such arbitrator shall be an attorney admitted to practice law in the Relevant Jurisdiction. No party to this agreement will challenge the jurisdiction or venue provisions as provided in this section. No party to this agreement will challenge the jurisdiction or venue provisions as provided in this section. Nothing contained herein shall prevent the party from obtaining an injunction. The breaching Party shall bear the attorney fees and arbitration fees of the non-breaching Party. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN

Doc ID: 598fea432b908deda545251098a18e788c661706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

BITMAIN                                                    v6.4.0

ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR
RELATING TO THIS AGREEMENT OR THE TRANSACTIONS
CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT OR
ANY OTHER THEORY.

16.6.    Severability. In case any provision of the Agreement shall be invalid, illegal or
unenforceable, the validity, legality and enforceability of the remaining provisions shall
not in any way be affected or impaired thereby. If, however, any provision of this
Agreement shall be invalid, illegal or unenforceable under any Applicable Law in any
jurisdiction, it shall, as to such jurisdiction, be deemed modified to conform to the
minimum requirements of such Applicable Law, or, if for any reason it is not deemed
so modified, it shall be invalid, illegal or unenforceable only to the extent of such
invalidity, illegality or limitation on enforceability without affecting the remaining
provisions of this Agreement, or the validity, legality or enforceability of such provision
in any other jurisdiction.

16.7.    Counterparts This Agreement may be executed in two or more counterparts, each of
which shall be deemed an original, but all of which together shall constitute one and
the same instrument. Facsimile and e-mailed copies of signatures shall be deemed to be
originals for purposes of the effectiveness of this Agreement.

*[The remainder of this page is intentionally left blank for signature]*

Doc ID: 598fea432b908deda54525109821a9783c551706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

# BITMAIN

v6.4.0

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement on the date first written above.

Signed for and on behalf of BITMAIN

**BITMAIN TECHNOLOGIES GEORGIA LIMITED**

Signature _____程然_____

Name:

Title:

Signed for and on behalf of Service Provider

**BENNETTECH LLC**

Signature _____

Name: _____Lixiong Hao_____

Title: _____Partner_____

Doc ID: 598fea432b908deda545251098a18e788c661706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249



BITMAIN                                          v6.1.0

APPENDIX I
SERVICE ORDER

Date: August 5, 2023
Ref. Number: BMHSBT202308-01

This is a Service Order under the Service Framework Agreement dated August 5, 2023 (the "Service Framework Agreement") between **BITMAIN TECHNOLOGIES GEORGIA LIMITED**, a corporation incorporated under the laws of the State of Georgia of the United States of America (File No. 21205283), having its registered office at 900 Old Roswell Lakes Parkway, Suite 310, Roswell, GA 30076 ("BITMAIN") and **BENNETTECH LLC**, a limited liability company formed under the laws of the state of South Carolina, the United States of America (File No. 230424-1529418), having its registered office at 215 East Bay St, Suite 201k #1712, Charleston, South Carolina 29401("Service Provider"). Unless otherwise specified, capitalized terms used herein shall have the same meaning as those defined in the Service Framework Agreement.

1.     **DATA CENTER FACILITY**

This Service Order is corresponding to the Information Memorandum of Data Center Facility submitted by the Service Provider on August 5, 2023 with the reference number of BMHSBT202308-01 attached hereto as EXHIBIT A (the "**Corresponding Memo**") as well as the Data Center Facility as described in the Corresponding Memo located at 2066 Malboro Rd, Bennetsville, South Carolina 29512.

2.     **HOSTING CAPACITY AND HOSTED SERVERS**

2.1.   Under this Service Order, Service Provider agrees to provide to BITMAIN Hosting Capacity as follows, together with the necessary onsite production and living facilities including office rooms, maintenance rooms, canteen, dormitory and toilets. The number of the Minimum Hosting Quantity shall be determined based on the calculation of each Hosted Server's rated power as 3,600W.

| Hosting Capacity (MW) | Minimum Hosting Quantity (Units) |
|---|---|
| 30 | 8,333 |

2.2.   The Parties acknowledge and agree that the actual Hosting Quantity in this instance shall be determined by the actual average power of Hosted Servers. Details of the Hosted Servers hereunder are as follows, subject to the specific model, power efficiency and quantity of the Hosted Servers actually delivered to the Data Center Facility. Service Provider shall ensure that the Data Center Facility has been connected to electrical power and reaches its standard operational conditions for each batch of Hosted Servers to be in Online Status on or before the respective estimated power-on date as set forth in the table below.

Doc ID: 598fea432b908deda54525'C98a18e786c561706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

# BITMAIN

v6.4.0

| Batch No. | Model | Power Efficiency (J/T) | Hosting Quantity (Units) | Estimated Arrival Date | Estimated Power-on Date |
|-----------|-------|------------------------|--------------------------|------------------------|-------------------------|
| 1 | S19XP | 21.5 | 9,000 | August 20, 2023 | September 30, 2023 |
| In Total | - | - | 9,000 | - | - |

2.3.   The Parties further acknowledge and agree that, subject to the Hosting Capacity and Minimum Hosting Quantity, BITMAIN shall be entitled to, from time to time, modify the model of the Hosted Servers and Hosting Quantity, at its sole discretion, by providing written notice (the "**Hosted Servers Modification Notice**") in the form attached hereto as EXHIBIT B of this Service Order seven (7) Business Days prior to the delivery, withdrawal, and/or replacement of the Hosted Servers.

Service Provider shall cooperate with BITMAIN to on-rack and/or de-rack of the Hosted Servers, power on additional Hosted Servers as applicable, and adjust the amount of the Deposit and Prepayment in accordance with the calculation methos provided the Service Framework Agreement. In the event where there is a decrease in the Deposit and Prepayment, Service Provider shall return the difference between the pre-adjustment Deposit and the post-adjustment Deposit in full to BITMAIN within ten (10) Business Days from the receipt of the Hosted Servers Modification Notice and return the Prepayment in accordance with Section 3.5(b) of the Service Framework Agreement.

## 3.   SERVICE AND FEES

3.1.   <u>Deposit</u>. BITMAIN shall pay to Service Provider the Deposit as set forth below in accordance with the Service Framework Agreement.

| Batch No. | Hosting Quantity (Units) | Deposit Breakdown | Deposit (US$) |
|-----------|--------------------------|-------------------|---------------|
| 1 | 9,000 | 9,000 × 3.6 (kW) × 0.075× 24 ×30 | 1,749,600.00 |
| In Total | 9,000 | - | 1,749,600.00 |

3.2.   <u>Hosting Fees</u>. The applicable Hosting Fee under this Service Order are as follows:

Normal Hosting Unit Price (including non-deductible taxes/expenses): US$0.075/kWh
Minimum Hosting Unit Price (including non-deductible taxes/expenses): US$0.065/kWh

Monthly Theoretical Hosting Fee (including non-deductible taxes/expenses): $\sum$Rated

Doc ID: 598fea432b908deda545251098a18e788c661706

 v6.4.0

Power of Each Hosted Server Powered-On (kW) × Normal Hosting Unit Price × 24× 30

3.3. <u>Other Fees</u>. BITMAIN shall pay the following fees as per use, provided that these fees may be incurred only after prior written approval of BITMAIN:

    (a)    On-rack fee (including non-deductible taxes/expenses): US$20 per Hosted Server

    (b)    De-rack fee (including non-deductible taxes/expenses): US$20 per Hosted Server

    (c)    Others (please specify): [N/A]

3.4. <u>Taxes and Expenses</u>.

Pursuant to the prevailing tax regulation of the State of South Carolina, the services provided by the Service Provider or the payment of any amounts made by BITMAIN are not subject to tax including but limited to sales and use tax, valued added tax and any other governmental charges and duties similar to the tax, hence the Service Provider shall not charge any additional taxes in relation to the services rendered under this agreement. If the tax regulation of the State of South Carolina changes, the taxes and expenses may be agreed and confirmed in writing by the Parties otherwise.

4.    **BILLING AND PAYMENT**

4.1.    The Prepayment is estimated as follows, subject to the quantity of the Hosted Servers powered-on as confirmed by documentation provided by Service Provider and the date of provision of such documentation by Service Provider:

| Batch No. | Hosting Quantity (Units) | Estimated Prepayment Breakdown | Estimated Prepayment Amount (US$) |
|---|---|---|---|
| 1 | 9,000 | 9,000 × 3.6 (kW) × 0.075× 24 ×30 | 1,749,600.00 |
| In Total | | - | 1,749,600.00 |

4.2.    All payment of Hosting Fee under this Service Order, including any remittance or refund of Hosting Fee, shall be made:

    ☒ via wire transfer of immediately available funds in the US Dollars to the bank account of designated by the receiving Party; or

    ☒ via other methods: USDT.

The Parties agree that BITMAIN shall be entitled to make payments via the foregoing methods in its sole discretion. In the event that Service Provider fails to provide or

Doc ID: 598fea432b908deda546251098a18e788c661706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

BITMAIN

v6.4.0

update (if applicable) the correct and the latest valid payment information of Service Provider, Service Provider shall not suspend provision of Services, terminate the Service Framework Agreement or this Service Order, or hold BITMAIN liable for any breach of contract for failure of BITMAIN to make payment due thereto.

4.3.   Account Information of Service Provider

[To be provided via payment instruction once available]

4.4.   Service Provider also agrees to receive payment in digital currency, by way of a transfer of USDT to the digital wallet address of USDT:

TVvVvSLpYQCbejKEvNvgvV3F4WTJT1jufW

The exchange rate between the USDT and US Dollars: USDT/US$=1/1. The Parties agree that Service Provider would not charge any additional handling fee.

4.5.   Due to the temporary closure of Signature Bank, BITMAIN hereby directs Bitmain Technologies Limited, a BITMAIN affiliate, to make all payments due and payable by BITMAIN to the Service Provider pursuant to this Agreement on the BITMAIN's behalf, via the following bank account until BITMAIN's further written notice indicated otherwise:

Company Name: Bitmain Technologies Limited
Company address: 11/F., Wheelock House, 20 Pedder Street, Central, Hong Kong
Account No: 36807848057
Bank Code: 003
Bank Name: Standard Chartered Bank (Hong Kong) Limited
Bank Address: Payment Centre, 15/F, Standard Chartered Tower, 388 Kwun Tong Road, Kwun Tong, Kowloon, Hong Kong
SWIFT Code: SCBLHKHHXXX

## 5.     TERM AND TERMINATION OF SERVICE ORDER

5.1.   This Service Order shall be effective from the date hereof and expire on the expiration or early termination of the Service Framework Agreement.

5.2.   This Service Order may be terminated prior to its expiration:

(a)     upon mutual agreement in writing of the Parties;

(b)     upon BITMAIN giving a written notice to Service Provider if the Data Center Facility fails to meet its standard operational conditions of the respective Hosting Capacity for the Hosted Servers to be in Online Status within thirty (30) calendar days after the estimated power-on date set forth in paragraph 2.1 of this Service Order; meanwhile, BITMAIN shall not be liable to pay Service Provider any fee, charges or expenses during the period of such operational conditions;

Doc ID: 598fea432b908deda545251098a18e788c661706



v6.4.0

(c)    upon Service Provider giving a written notice to BITMAIN if BITMAIN fails to deliver the first batch of Hosted Servers within thirty (30) calendar days from (i) the estimated arrival date set forth in paragraph 2.2 of this Service Order, or (ii) the actual date on which the Data Center Facility meets the standard operational conditions of the respective Hosting Capacity, whichever is later; and

(d)    upon either Party giving a written notice of no less than sixty (60) calendar days to the other Party, *provided that* a compensation in an amount equal to Monthly Theoretical Hosting Fee shall be paid by this Party to such other Party upon termination.

5.3.    Upon expiration or early termination of this Service Order, Service Provider shall:

(a)    in any event no later than five (5) Business Days from the expiration or early termination, issue the invoice of the Hosting Fee for the unpaid Billing Period, with the Reconciliation Statement for such unpaid Billing Period and the supporting documents proving the Power Consumption for the such Billing Period (e.g., photos of the Separate Meter showing the Power Consumption at the end of such Billing Period) as attachments to the invoice in accordance with Article 3.6(a) of the Service Framework Agreement; and

(b)    issue to BITMAIN the updated invoice(s) of the Hosting Fees for the unpaid Billing Period(s) in accordance with Articles 3.6(b)(ii) and 3.6(b)(iii) of the Service Framework Agreement (if applicable).

5.4.    Settlement of Last Invoice

BITMAIN shall make payment(s) to Service Provider to settle the outstanding amount in the invoice for the unpaid Billing Period(s) in accordance with Article 3.6(h) of the Service Framework Agreement (if applicable).

6.    PREVAILING PROVISION

In the event of any discrepancy between the provision of this Service Order and the Service Framework Agreement, the provision in this Service Order shall prevail.

*[The remainder of this page is intentionally left blank for signature]*

Doc ID: 598fea432b903dada54525f098a18e788c661706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

# BITMAIN

v6.4.0

IN WITNESS WHEREOF, the undersigned have executed this Service Order on the date first written above.

Signed for and on behalf of BITMAIN

BITMAIN    TECHNOLOGIES    GEORGIA
LIMITED

程然

Signature_____
Name:
Title:

Signed for and on behalf of Service Provider

BENNETTECH LLC

Signature_____
Name:     Lixiong Hao
Title:     Partner

Doc ID: 598fea432b908deda545251098a18e788c661706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

BITMAIN                                                        v6.4.0

## EXHIBIT A
## INFORMATION MEMORANDUM OF DATA CENTER FACILITY

Service Provider: BENNETTECH LLC
Submission Date: August 5, 2023
Ref. Number: BMHSBT202308-01

| BASIC INFORMATION | |
|---|---|
| Location | 2066 Malboro Rd, Bennetsville, South Carolina 29512 |
| Jurisdiction | South Carolina |
| Land Area (sq. m) | 435.1 Acres |
| Building Area (sq. m) | 100,000 SqFt |
| Construction Structure | ☒ Steel Structure   ☐ Warehouse   ☐ Container |
| Designed No. of Racks | 141 |
| Heat Dissipation Method | ☐ Hydro Cooling ☒ Air Cooling |

| Local Temperature (°C) | Max. | 89F // 32C | Min. | 37F // 3C | Avg. | 74F // 23C |
|---|---|---|---|---|---|---|
| Server Air Inlet Temperature (°C) | Max. | 75F // 24C | Min. | 33F // 1C | Avg. | 77F//25C |

| | |
|---|---|
| Humidity (%) | 67.5% |
| Air Pressure (kPa) | 30.06 "Hg |

| ELECTRICAL POWER | |
|---|---|
| Power Type | ☒ Grid hybrid ☐ Wind ☐ Solar ☐ Hydro ☐ Nuclear |
| Electricity Cost (US$ / kWh) | US$ 0.065/kWh |
| Max. Power Capacity (MW) | 30 MW |
| Minimum Power Commitment | ☐ Not Available   ☒ 2.8 MW |

| NETWORK | |
|---|---|
| Network Operator | Spectrum or Sandhill |
| Network Bandwidth, Mb/s | 1000Mb/s |

| Conditions of Prepayment | |
|---|---|
| 1. | Service Provider completed the construction of the Data Center Facility and passed the inspection of the Data Center Facility by BITMAIN; |
| 2. | The Data Center Facility has the capability to connect to electrical power for the respective batch of Hosted Servers; and |
| 3. | The respective batch of Hosted Servers has been on-racked and connected to electrical power. |

**Conditions of Payment of Deposit**

Doc ID: 595fea432b908eeda545251098a18e788c661706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

# BITMAIN

v6.4.0

| 1. | The high-voltage, medium-voltage and low-voltage transformers arrived at the Data Center Facility; |
|----|---|
| 2. | The wiring between high-voltage and low-voltage transformers is completed; |
| 3. | The construction of infrastructure, including but not limited to site hardening of the Data Center Facility, construction of facilities and buildings are completed; and |
| 4. | The site protection facilities of the Data Center Facility are set up, and the Data Center Facility has the capability of basic safety protection. |

| COMPLIANCE STATUS | |
|---|---|
| Project Approval Documents | ☐ Not Available<br>☒ Provided to BITMAIN on [06/20/2023] |
| Power Purchase Agreement(s) | ☐ Not Available<br>☒ Provided to BITMAIN on [06/20/2023] |
| Land Title Document | ☐ Not Available<br>☐ Land Ownership Certificate OR ☒ Lease Agreement OR ☐ Land License Agreement provided to BITMAIN on [06/20/2023] |
| Ultimate Beneficiary Owner of Data Center Facility[2] | Gao Feng |

| OTHER INFORMATION |
|---|
| The installation location of the separate meter: container. |

---

[2] Please indicate the ultimate beneficial owner who is either (i) an individual, or (ii) a company listed on a qualified stock exchange.

Doc ID: 598fea432b908deda545251098a18e788c661706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

# BITMAIN

v6.4.0

EXHIBIT B
## NOTICE OF HOSTED SERVERS MODIFICATION
Notice Ref. Number: []

[Date]

Via email

Service Provider: BENNETTECH LLC ("Service Provider")

Service Order Number: BMHSBT202308-01

Subject: Modification of Hosted Servers under Service Order [BMHSBT202308-01]

This Hosted Servers Modification Notice (the "Notice") is being provided in accordance with the Service Framework Agreement dated [     ] between Bitmain Technologies Georgia Limited ("BITMAIN" or "we") and Service Provider, and the Service Order dated [     ] thereunder.

This Notice is to inform you of the modification to the Hosted Servers as per paragraph 2.3 of the Service Order. BITMAIN, in its sole discretion, has decided to modify

☐ the model of the Hosted Servers, and/or

☐ Hosting Quantity.

1. Hosted Servers. Details of the Hosted Servers hereunder are as follows, subject to the specific model, power efficiency and quantity of the Hosted Servers actually delivered to the Data Center Facility:

| Batch No. | Model | Power Efficiency (J/T) | Hosting Quantity (Units) | Estimated Arrival Date | Estimated Power-on Date |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | | | | |
| [TBD] | | | | | |
| In Total | - | - | - | | |

Service Provider shall ensure each batch of Hosted Servers to be in Online Status on or before the respective estimated power-on date as set forth in the table above.

2. Deposit. The amount of the Deposit shall be revised as follows.

Doc ID: 595fea432e908deda545251096a18e786c661706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

# BITMAIN

v6.1.0

| Batch No. | Hosting Quantity (Units) | Deposit Breakdown | Deposit (US$) |
|---|---|---|---|
| 1 | | *[Please insert the corresponding Hosting Quantity] × 3.6 (kW) × [Please insert the Normal Hosting Unit Price] × 24 ×30* | |
| 2 | | *[Please insert the corresponding Hosting Quantity] × 3.6 (kW) × [Please insert the Normal Hosting Unit Price] × 24 ×30* | |
| *[TBD]* | | *[Please insert the corresponding Hosting Quantity] × 3.6 (kW) × [Please insert the Normal Hosting Unit Price] × 24 ×30* | |
| In Total | | - | |

3.  Prepayment. The estimated amount of Prepayment shall be revised as follows, subject to the quantity of the Hosted Servers powered-on as confirmed by documentation provided by Service Provider and the date of provision of such documentation by Service Provider:

| Batch No. | Hosting Quantity (Units) | Estimated Prepayment Breakdown | Estimated Prepayment Amount (US$) |
|---|---|---|---|
| 1 | | *3.6 (kW) × [Please insert the corresponding Hosting Quantity] × [Please insert the Normal Hosting Unit Price] × 24 × 30* | |
| 2 | | *3.6 (kW) × [Please insert the corresponding Hosting Quantity] × [Please insert the Normal Hosting Unit Price] × 24 × 30* | |
| *[TBD]* | | *3.6 (kW) × [Please insert the corresponding Hosting Quantity] × [Please insert the Normal Hosting Unit Price] × 24 × 30* | |
| In Total | | - | |

4. Payment.

☐ In the event where there is an increase in the Deposit and Prepayment, BITMAIN shall, make additional payment of Deposit and Prepayment in accordance with the terms in the Service Framework Agreement.

Doc ID: 598fea432b908deda545251098a18e788c661706

BITMAIN                                          v6.4.0

☐  In the event where there is a decrease in the Deposit and Prepayment, Service Provider shall return the difference between the pre-adjustment Deposit and the post-adjustment Deposit in full to BITMAIN within ten (10) Business Days from the receipt of the Hosted Servers Modification Notice and return the Prepayment in accordance with Section 3.5(b) of the Service Framework Agreement.

The aforementioned modifications are to take effect on [effective date]. We kindly request that you make the necessary arrangements for the on-rack and power-on of the additional Hosted Servers as specified above.

Capitalized terms not defined herein shall have the meaning assigned to them in the Framework Agreement and the Agreement.

Please acknowledge receipt of this notice and confirm your understanding of the changes by receipt of this Hosted Servers Modification Notice by signing and returning a copy of this notice to us within three (3) Business Days, no later than [specify deadline]. If no acknowledgment of receipt is received by the deadline mentioned above, the Notice shall be deemed accepted by Service Provider.

Thank you for your prompt attention to this matter.

Sincerely,

Signed for and on behalf of BITMAIN

BITMAIN    TECHNOLOGIES    GEORGIA
LIMITED

Signature
Name:
Title:

Acknowledged and Agreed:

BENNETTECH LLC

Signature
Name:
Title:

Doc ID: 598fea432b908deda545251098a18e788c661706

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

Doc ID: 598fea432b908deda5452510 98a18e788c561706

BITMAIN

v6.1.0

## APPENDIX II
### FORM OF RECONCILIATION STATEMENT

| Hosting Capacity 矿场容量 (MW) | Actual Hosting Quantity 实际托管数量 (Units) | Billing Period 计费周期 | Power Consumption 耗电量 (kW) | Online Status Ratio 在线率 | Actual Hosting Unit Price 实际托管单价(US$) | Total Hosting Fee 总费用(US$) |
|---|---|---|---|---|---|---|
| | | | | | | |

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

Doc ID: 598fea432b59d6deda5452510g8a18c7f8dc661765

BITMAIN

v6.5.0

## APPENDIX III
### FORM OF CONFIRMATION OF HOSTED SERVERS SECURITY

Service Provider: BENNETTECH LLC

Submission Date: [          ]

| Date | Service Order Ref. Number | Hosting Quantity (Units) | Site* | Model | Hashrate (T/Hs) | Sub-account Name | Online Quantity* (Units) (B) | Power-shortage Quantity* (Units) (C) | Maintenance Quantity* (Units) (D) | Total Quantity (Units) (A) = (B) + (C) + (D) |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
| In Total |  |  |  |  |  |  |  |  |  |  |

\* *Note:*

1. For "Site", please indicate the exact building of the Data Center Facility where the corresponding Hosted Servers are stored and operated.
2. *Definitions*
   1) "Hosting Quantity" means number of the Hosted Servers hosted in the Data Center Facility;
   2) "Online Status" means the status of a Hosted Server that is powered-on with constant supply of electrical power, has stable connection with network and is accessible. For the "Online Quantity", please indicate the number of Hosted Servers in Online Status counted on the submission date of this Confirmation of Hosted Servers Security.
   3) "Power-shortage Status" means the status of a Hosted Server which has been delivered to the Data Center Facility that (a) is not powered-on yet, or (b) experiences power outage for a consecutive of twenty-four (24) hours or more after being powered-on, and is not in Maintenance Status (as defined below). For the "Power-shortage Quantity", please indicate the number of Hosted Servers in Power-shortage Status counted on the submission date of this Confirmation of Hosted Servers Security.

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

Doc ID: 598fea432b9086deda545251098a18e788c561706

BITMAIN

v6.4.0

4) *"Maintenance Status" means the status of a Hosted Server that is experiencing defect, failure or malfunction, and has been de-racked pending maintenance or under maintenance. For the "Maintenance Quantity", please indicate the number of Hosted Servers in Maintenance Status counted on the submission date of this Confirmation of Hosted Servers Security.*

To ensure the healthy and long-term mutual cooperation and maintain business relationships with ordinary interest between the Parties, the Service Provider hereby certifies that none of the events described below have occurred and are continuing and none of the circumstances described below exist except as identified below in which case the details of each event or circumstance are set forth below in reasonable detail:

|  |  | ☐ Yes | Please specify the details: |
|---|---|---|---|
| 1. | Insolvency or bankruptcy proceedings initiated or threatened | ☐ No / | |
| 2. | Material judgments against Service Provider | ☐ Yes ☐ No / | Please specify the details: |
| 3. | Material asset reorganization of Service Provider | ☐ Yes ☐ No / | Please specify the details: |
| 4. | Material dispute, claim, litigation or arbitration involving Service Provider | ☐ Yes ☐ No / | Please specify the details: |
| 5. | Other circumstance that has had, has, or could reasonably be expected to have a material adverse effect on the business of the Service Provider | ☐ Yes ☐ No / | Please specify the details: |

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF MARLBORO | ) | C.A. No. 2024-CP-34- |
| | ) | |
| LAMILL HOLDING COMPANY, and AGA CAPITAL, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | **NOTICE OF MOTION** |
| | ) | **AND MOTION** |
| v. | ) | |
| | ) | |
| BITMAIN TECHNOLOGY GEORGIA LIMITED, | ) | |
| | ) | |
| Defendant. | ) | |

**TO:   BITMAIN TECHNOLOGY GEORGIA LIMITED, DEFENDANT, AND IT'S ATTORNEY, SOREN YOUNG, NELSON MULLINS RILEY & SCARBOROUGH LLP, ADR SERVICES FOR AMERICAN ARBITRATION ASSOCIATION AND ITS REPRESENTATIVE, CHIMDIMMA ONYEDEBELU:**

YOU WILL TAKE NOTICE that the Plaintiffs, Lamill Holding Company, ("Lamill") and AGA Capital, LLC, f/k/a AGA Mining, LLC ("AGA," together with Lamill, the "Plaintiffs"), by and through their undersigned counsel, move the presiding Circuit Court Judge for Marlboro County, Court of Common Pleas on the tenth (10th) day after service hereof, or at such other time and date convenient to the Court and Counsel, in the Marlboro County Court of Common Pleas, for an order staying the arbitration proceedings in the matter of Bitmain Technology Georgia Limited vs. Bennettech LLC, Lamill Holding Company, and AGA Capital, LLC (Arbitration Case No. 01-24-0005-7869).

S.C. Code Ann § 15-48-20 (b)(2005) allows the Court "... on application to stay an arbitration proceeding commenced or threatened on a showing that there is no agreement

ELECTRONICALLY FILED - 2024 Jul 25 11:01 AM - MARLBORO - COMMON PLEAS - CASE#2024CP3400249

to arbitrate". The Plaintiff will suffer extreme prejudice if the stay is not ordered and will be deprived of important constitutional, due process, substantive, and procedural rights.

The motion is be based upon the Plaintiffs complaint for a declaratory judgement and applicable statutory and case law.

## ROBERT E. LEE, LLC

s/Robert E. Lee

Robert E. Lee – S.C. Bar No. 63052
Post Office Box 1096
Marion, South Carolina 29571
Telephone:   843-423-1313
Facsimile:    843-433-8258
E-Mail:       rel@rellawfirm.com

July 25, 2024                    **ATTORNEY FOR THE PLAINTIFFS**
Marion, South Carolina

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF MARLBORO | ) | C.A. No. 2024-CP-34-00249 |
| | ) | |
| LAMILL HOLDING COMPANY, and AGA CAPITAL, LLC, | ) ) | |
| | ) | |
| Plaintiffs, | ) | **ORDER GRANTING *EX PARTE*** |
| | ) | **RESTRAINING ORDER** |
| v. | ) | **AND** |
| | ) | **PRELIMINARY INJUNCTION** |
| BITMAIN TECHNOLOGY GEORGIA LIMITED, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter came before the Court on Plaintiffs' Motion for a *Temporary Restraining Order* and *Preliminary Injunction* against Defendant. This matter was heard Ex Parte without notice and on July 24, 2024. Robert E. Lee appeared on behalf of Plaintiffs.

After consideration of the evidence presented by affidavit, and the arguments and representations of counsel, this Court finds:

1.    There is sufficient evidence that Defendants are not entitled to compel the Plaintiffs, as non-signatories to an agreement to arbitrate, under S.C. Code Ann. § 15-48-10 to proceed to defend claims brought against them under arbitration proceedings brought in the American Arbitration Association, Arbitration Case No. 01-24-0005-7869 (the "arbitration proceedings").

2.    Plaintiffs will suffer irreparable injury if Defendant and non-party American Arbitration Association are not restrained from continuing the arbitration proceedings against the Plaintiffs.

3.    The Defendant and non-party American Arbitration Association enjoined from continuing the arbitration proceedings will suffer minimal or no harm because of the injunction.

4.    There appears a strong likelihood of success on the merits of the Plaintiffs' Complaint.

5.    As such, an Order restraining the Defendant from such actions is warranted for ten (10) days.

Page 1 of 2



**IT IS THEREFORE ORDERED** that Defendant be and is hereby enjoined from continuing the arbitration proceedings against the Plaintiffs.

**IT IS FURTHER ORDERED** that non-party the American Arbitration Association be and is hereby enjoined from continuing the arbitration proceedings against the Plaintiffs.

**IT IS FURTHER ORDERED** that this order shall be effective for Ten (10) days from the date below.

**IT IS FURTHER ORDERED** that Plaintiffs are not required to pay a security bond with the Court.

**IT IS SO ORDERED**

Honorable Paul M. Burch
Resident Judge of the Fourth Circuit
Court of Common Pleas

July 25th, 2024
3:40 pm

STATE OF SOUTH CAROLINA )

COUNTY OF MARLBORO )

LAMILL HOLDING COMPANY, and
AGA CAPITAL, LLC,

                    Plaintiffs,

            v.

BITMAIN TECHNOLOGY GEORGIA
LIMITED,

                    Defendant.

IN THE COURT OF COMMON PLEAS

C.A. No. 2024-CP-34-00249

**ORDER GRANTING *EX PARTE*
RESTRAINING ORDER
AND
PRELIMINARY INJUNCTION**

This matter came before the Court on Plaintiffs' Motion for a *Temporary Restraining Order* and *Preliminary Injunction* against Defendant. This matter was heard Ex Parte without notice and on July 24, 2024. Robert E. Lee appeared on behalf of Plaintiffs.

After consideration of the evidence presented by affidavit, and the arguments and representations of counsel, this Court finds:

1. There is sufficient evidence that Defendants are not entitled to compel the Plaintiffs, as non-signatories to an agreement to arbitrate, under S.C. Code Ann. § 15-48-10 to proceed to defend claims brought against them under arbitration proceedings brought in the American Arbitration Association, Arbitration Case No. 01-24-0005-7869 (the "arbitration proceedings").

2. Plaintiffs will suffer irreparable injury if Defendant and non-party American Arbitration Association are not restrained from continuing the arbitration proceedings against the Plaintiffs.

3. The Defendant and non-party American Arbitration Association enjoined from continuing the arbitration proceedings will suffer minimal or no harm because of the injunction.

4. There appears a strong likelihood of success on the merits of the Plaintiffs' Complaint.

5. As such, an Order restraining the Defendant from such actions is warranted for ten (10) days.

**IT IS THEREFORE ORDERED** that Defendant be and is hereby enjoined from continuing the arbitration proceedings against the Plaintiffs.

**IT IS FURTHER ORDERED** that non-party the American Arbitration Association be and is hereby enjoined from continuing the arbitration proceedings against the Plaintiffs.

**IT IS FURTHER ORDERED** that this order shall be effective for Ten (10) days from the date below.

**IT IS FURTHER ORDERED** that Plaintiffs are not required to pay a security bond with the Court.

**IT IS SO ORDERED**

Honorable Paul M. Burch
Resident Judge of the Fourth Circuit
Court of Common Pleas

July 25th, 2024
3:40 pm

2024 JUL 25 P 4: 04
ANITA M. WILLIAMS
CLERK OF COURT
MARLBORO COUNTY, S.C.
FILED