AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| BITMAIN TECHNOLOGY GEORGIA LIMITED, a Georgia corporation,<br><br>      Claimant,<br><br>v.<br><br>BENNETTECH LLC, LAMILL HOLDING COMPANY, AGA MINING, LLC, and SPARC FOUNDRY, LLC,<br><br>      Respondents. | Arbitration Case No. _____<br><br>CLAIMANT BITMAIN TECHNOLOGIES LIMITED'S DEMAND FOR ARBITRATION |

Claimant Bitmain Technologies Georgia Limited ("Bitmain") hereby alleges and claims as follows:

**INTRODUCTION**

1. Bitmain brings this demand for arbitration against Bennettech LLC ("Bennettech" or "Service Provider"), its members, Lamill Holding Company and AGA Mining, LLC, and a wholly owned subsidiary, Sparc Foundry, LLC, for breach of a Service Framework Agreement dated August 5, 2023 (the "SFA"). A true and accurate copy of the SFA is attached as Exhibit 1.

2. As explained in greater detail below, Bitmain develops and manufactures application-specific integrated circuit ("ASIC") miners, specialized computers that are optimized to efficiently miner bitcoin. Pursuant to the SFA, Bennettech agreed to provision and operate a data center in which Bitmain would use 9,000 ASIC miners (the "Hosted Servers") to generate revenue by mining Bitcoin. The SFA required Bennettech to, *inter alia*, provide the significant amounts of electric power required to operate the Hosted Servers and to ensure the safety and security of the Hosted Servers.

3. Bennetech leased a facility in Bennetsville, South Carolina (the "Data Center Facility") to house the Hosted Servers. Bennettech did not lease the Data Center Facility directly

1

from its owner, KAMCP, LLC ("KAMCP" or the "Landlord"). Rather, KAMCP leased the Data Center Facility to ARCm Realty LLC, which subleased the Data Center Facility to Woodlands Edge, Inc., which subleased the Data Center Facility to Bennettech.

4. In November 2023, after Bitmain's Hosted Servers had been online for only one month, the electric power provider, Marlboro Electric Cooperative, disconnected power to the Data Center Facility due to non-payment. This rendered the Data Center Facility unfit for mining bitcoin and breached Bennettech's obligation under the SFA to provide sufficient poser to the Data Center Facility and the Hosted Servers. Bennettech never remedied this breach.

5. The Data Center Facility sat idle, each day depriving Bitmain of the ability to generate mining revenue, until June 2, 2024, when Bitmain exercised its right to terminate the SFA.

6. Upon termination, Bennettech was required to return Bitmain's deposit and prepayment, totaling $2,581,437.60. Also, because Bitmain terminated the SFA due to Bennettech's continuing failure to provide sufficient power to the Data Center Facility, the SFA required Bennettech to pay Bitmain $1,749,600, calculated based on the expected hosting fee for one month. Bennettech has also failed to pay this contractually required amount.

7. On January 30, 2023, Bitmain notified Bennettech that Bitmain would exercise its right to enter the Data Center Facility to remove Bitmain's Hosted Servers due to Bennettech's failure to provide sufficient power to the Data Center Facility. This did not happen. Instead, KAMCP, the landlord, refused to allow Bitmain or Bennettech to access the Data Center Facility and asserted that Bitmain was responsible for damage to the Data Center Facility that KAMCP alleged had occurred due to the bitcoin mining operation. Bitmain was forced to file a lawsuit in South Carolina state court to recover its Hosted Servers. Although Bitmain secured the release of

2

its Hosted Servers, it incurred significant costs in relation to the removal of the Hosted Servers, damages that directly relate to Bennettech's operation of the Data Center Facility. The SFA requires Bennettech to indemnify Bitmain for all costs related to the litigation against KAMCP, including attorneys' fees, court costs, and the cost of the resolution of Bitmain's litigation with KAMCP.

8.  Bitmain brings this Arbitration Demand to seek damages for Bennettech's numerous breaches of the SFA and to seek indemnification for the costs Bitmain incurred in relation to its litigation against KAMCP.

## THE PARTIES

9.  Claimant Bitmain Technologies Georgia Limited is a Georgia corporation headquartered in Roswell, Georgia.

10. Respondent Bennetech, LLC is a limited liability company formed under the laws of the State of South Carolina.

11. Respondent Lamill Holding Company ("Lamill") is, upon information and belief, a corporation operating in the State of South Carolina. Upon information and belief, Lamill is one of two members of Bennettech, LLC.

12. Respondent AGA Mining, LLC ("AGA") is, upon information and belief, a limited liability corporation operating in the State of South Carolina. Upon information and belief, AGA is one of two members of Bennettech, LLC.

13. Respondent Sparc Foundry LLC ("Sparc") is a limited liability company formed under the laws of the State of South Carolina. Upon information and belief, Bennettech, LLC is the sole member of Sparc.

14. Respondents Bennettech, Lamill, AGA, and Sparc share the same address: 215 East Bayt St., Suite 201k #1712, Charleston, SC 29401.

15. Respondents Lamill, AGA, and Sparc are alter egos of Respondent Bennettech.

## THE ARBITRATION CLAUSE

16. Bitmain and Bennetech agreed to submit all disputes arising under the SFA to arbitration in Houston, Texas before a single arbitrator of the American Arbitration Association ("AAA"). Ex. 1, SFA, Article 16.5.)

17. Pursuant to the SFA, "the arbitrator shall be selected by application of the rules of the AAA, or by mutual agreement of the parties, except that such arbitrator shall be an attorney admitted to practice in the Relevant Jurisdiction." Ex. 1, SFA, Article 16.5.

18. The parties agreed that the SFA "shall be solely governed by and construed in accordance with the laws of the Relevant Jurisdiction, without regarding to principles of conflict of laws." Ex. 1, SFA Article 16.4.

19. The SFA defines the "Relevant Jurisdiction" as the State of Georgia. Ex. 1, SFA, Article 1.1.

20. Accordingly, this Tribunal should apply Georgia law to Bitmain's claims.

## GENERAL ALLEGATIONS

*Bitcoin Mining*

21. Bitcoin is a crypto-asset that uses cryptographic principles to allow owners of bitcoin to securely transact with each other and to prove ownership of bitcoin via the bitcoin blockchain, a decentralized public ledger.

22. No single organization controls bitcoin. Rather, the bitcoin crypto-protocol maintains the bitcoin blockchain and provides for new bitcoins to enter the economy through a mechanism known as "mining." Individuals "mine" bitcoin by using sophisticated computer

4

programs to perform complex, resource-intensive computations which validate past bitcoin transactions. Once the transactions are validated, they are added to the bitcoin blockchain.

23. The mining process is competitive. The first miner to validate a block of transactions is rewarded with an amount of bitcoin, while other miners get nothing for that block. Blocks are mined on average once every ten minutes. From 2020 through April 20, 2024, the reward for validating a block of transactions was 6.5 bitcoin. Since April 20, 2024, the reward for validating a block of transactions has been 3.125 bitcoin. Bitcoin miners can either sell the bitcoin for a fiat current, such as U.S. dollars, or hold the bitcoin as an investment. At the current price of bitcoin, the reward for mining a single block of bitcoin is worth approximately $200,000.

24. Because the computations required to mine bitcoin are highly complex, miners typically use machines equipped with application-specific integrated circuit ("ASIC") chips to stay competitive. These machines are custom-built to efficiently mine bitcoin and can cost thousands of dollars. To increase their profitability, miners often operate hundreds or even thousands of ASIC miners at a time.

25. Bitcoin mining, especially at a commercial scale, consumes significant amounts of electric power. Without a reliable source of electric power, ASIC miners cannot be put to a productive use.

26. ASIC miners are sophisticated electronic devices. As such, they are vulnerable to damage from a variety of sources, such as water and moisture, heat, dust and debris, static electricity, and physical injury. To mitigate the risk of damage, ASIC miners are typically stored in secured, climate-controlled data centers.

*The Service Framework Agreement*

27. On August 5, 2023, Bitmain and Bennettech entered into the SFA.

28. The SFA is a valid and enforceable contract.

29. The SFA incorporated a Service Order, attached to the SFA as Appendix I, which the Parties executed on August 5, 2023.

30. The Service Order is a valid and enforceable contract.

31. Pursuant to the SFA and the Service Order, Bennettech was required to, among other things, provision and operate a facility at which Bitmain would use the Hosted Servers to mine bitcoin. Because Bennettech did not have a facility of its own suitable to operate the data center, it leased the Data Center Facility from a third party.

32. On May 23, 2023, Bennetech entered into an agreement with Woodlands Edge, Inc. ("Woodlands Edge") under which Bennetech leased 100,000 square feet of facility located at 2066 Malboro Way, Bennettsville South Carolina. Ex. 1, SFA, Appendix A.

33. Upon information and belief, Woodlands Edge leased the Data Center Facility from ARCm Realty, which leased the facility from KAMCP, the owner of the Data Center Facility.

34. The Hosted Servers must be connected to electric power and to the internet to operate productively. It therefore was critical to Bitmain in executing the SFA that Bennettech be able to provide a constant flow of sufficient power to the Data Center Facility. Accordingly, Article 6.1 of the SFA required Bennettech to "provide Bitmain with sufficient . . . power load and facilities . . . reasonably required for the normal operation of the Hosted Servers." Ex. 1, SFA, Article 6.1.

35. Bennettech further agreed that "[t]he power load provided by Service Provider [i.e., Bennettech], shall satisfy the requirements of this Agreement, the Service Orders and standard operational conditions." Ex. 1, Article 6.1(e). Under the Service Order, Bennettech agreed to provide 30 MW of electric power to the Hosted Servers. Ex. 1, Service Order, Article 2.1.

36. Upon information and belief, Bennettech arranged for electric power to the Data Center Facility through Sparc Foundry, LLC ("Sparc"), a South Carolina limited liability company

6

whose sole member is Bennettech. Sparc contracted with Marlboro Electric Cooperative, a local electric power company, to provide electric power to the Data Center Facility.

37. Because it was important to Bitmain that the Hosted Servers be productively running as much as possible, the SFA required SPS to keep the Hosted Servers online on the monitoring software and contributing its computational power to the mining pool as designated by Bitmain at least 95% of the time, on average. To measure this, the SFA defined "Online Status Ratio" as follows:

> "Online Status Ratio" means a fraction where the numerator is the sum of the actual length of time of each Hosted Server in Online Status during the applicable Billing Period, and the denominator is the product of the Hosting Quantity of Hosted Servers and the theoretical length of time of each Hosted Server in Online Status during the applicable Billing Period.

SFA, Article 1.1.

38. This means that in a 30-day billing period, the Online Status Ratio would be calculated as follows:

$$\frac{\text{Total number of minutes that all Hosted Servers are online in the 30-day period}}{(\text{Number of Hosted Servers}) \times (30 \text{ days} \times 24 \text{ hours} \times 60 \text{ minutes})} = \text{Online Status Ratio}$$

39. Article 6.9(a) of the SFA required Bennettech to maintain an Online Status Ratio of at least 95%.

40. If the Online Status Ratio dropped below 95%, the SFA gave Bennettech one month to remedy the situation, after which Bitmain could "terminate this Agreement with immediate effect without any liability for breach of contract." Ex. 1, SFA, Article 6.9(b-c).

41. Bennettech was also required to "take standard industry practices and all necessary measures . . . to ensure the safety and security of the Data Center Facility." Ex. 1, SFA, Article 6.5.

42.    As compensation for Bennettech's services, Bitmain agreed to pay Bennettech a monthly fee (the "Hosting Fee") based on the number of Hosted Servers in operation at the Data Center Facility and the amount of electrical power consumed by the Hosted Servers during a given month. Ex. 1, SFA, Article 3.1.

43.    Upon the execution of the SFA, Bitmain agreed to pay Bennettech a Deposit in the amount of $1,749,600. Ex. 1, SFA, Article 3.4. The deposit was calculated based on the total number of Hosted Servers and their expected power consumption and was intended to represent the parties' best estimation of Bitmain's expected payments for one month:

3.1.  Deposit. BITMAIN shall pay to Service Provider the Deposit as set forth below in accordance with the Service Framework Agreement.

| Batch No. | Hosting Quantity (Units) | Deposit Breakdown | Deposit (US$) |
|---|---|---|---|
| 1 | 9,000 | 9,000 × 3.6 (kW) × 0.075 × 24 × 30 | 1,749,600.00 |
| In Total | 9,000 | - | 1,749,600.00 |

Ex. 1., Service Order, Article 3.1.

44.    On September 18, 2023, Bitmain paid Bennettech the $1,749,600 deposit.

45.    Bitmain also agree to render a $831,837.60 Prepayment to Bennettech in an amount based on Bitmain's expected monthly Hosting Fees. Ex. 1, SFA, Article 3.5.

46.    On September 18, 2023, Bitmain paid Bennettech the $831,837.60 Prepayment.

47.    So that the parties could accurately estimate Bitmain's expected monthly payments under the contract, the SFA calculated a Monthly Theoretical Hosting Fee, which "means the theoretical amount of the Hosting Fee for one (1) month." Ex. 1, SFA, Article 1.1; Service Order, Article 3.2. The Monthly Theoretical Hosting Fee under the SFA was $1,749,600.

*Bennettech Breaches the SFA By Failing to Provide Sufficient Power to the Data Center Facility*

48. From August 24, 2023, to September 16, 2023, Bitmain transported its 9,000 Hosted Servers to the Bennettsville Facility and, from October 13, 2023, through November 23, 2023, Bitmain operated the Hosted Servers to mine bitcoin.

49. At the time they were in operation, the Hosted Servers were capable of generating approximately 1.9 bitcoin in mining rewards each day, a value of approximately $125,400 at the current price of bitcoin.

50. On November 23, 2023, electric power to the Bennettsville facility was disconnected. Upon information and belief, the electric power was disconnected because Sparc failed to pay the amounts due under its contract with Marlboro Electric Cooperative, its electric provider.

51. The disconnection of electric power rendered the Data Center Facility useless for mining bitcoin and breached Bennettech's obligation under the SFA to "provide Bitmain with sufficient . . . power load and facilities . . . reasonably required for the normal operation of the Hosted Servers." Ex. 1, SFA, Article 6.1.

52. With the electric power to the Data Center Facility disconnected, the Hosted Servers could not operate and therefore were no longer Online. Therefore, the Online Status Ratio for the Hosted Servers dropped below 95% in November 2023 and has been at 0% for every month since then. By allowing the Online Status Ratio to drop below 95%, Bennettech breached Article 6.9 of the SFA. Bennettech's failure to remedy this breach within one month allowed Bitmain to terminate the SFA.

*Bitmain Exercises Its Right to Terminate the SFA*

53. On June 2, 2024, Bitmain informed Bennettech in writing that Bitmain was exercising its right to terminate the SFA pursuant to, among other provisions, Articles 6.9(c) and

9

11.2(d) due to Bennettech's failure to maintain a sufficient Online Status Ratio of the Hosted Servers for more than three months.

54. Upon termination, Bennettech was required to return Bitmain's $1,749,600 deposit. Ex. 1, SFA, Article 11.3(a)(i).

55. Bennettech was also required to return Bitmain's $831,837.60 Prepayment.

56. Because Bitmain exercised its right to terminate the SFA due to Bennettech's unremedied breach of Article 6.9(c), Bennettech was also required to pay Bitmain compensation in an amount equal to the Monthly Theoretical Hosting Fee of $1,749,600. Ex. 1, SFA, Article 11.2(c).

57. Bennettech has failed to return the $1,749,600 Deposit, to return the $831,837.60 Prepayment, or to pay Bitmain the $1,749,600 compensation required due to its unremedied breach of Article 6.9(c).

58. Accordingly, Bennettech is in breach of its post-termination payment obligations under the SFA.

***Bitmain is Forced to Incur Excessive Removal Costs Due to Bennettech's Breach of the SFA***

59. Pursuant to Article 6.7 of the SFA, Bitmain was to enjoy unfettered access to the Data Center Facility.

60. Due to Bennettech's failure to supply sufficient power to the Data Center Facility, on January 30, 2024, Bitmain informed Bennettech that Bitmain intended to exercise its right under Article 6.7 of the SFA to access the Data Center Facility and remove Bitmain's Hosted Servers.

61. On February 9, 2024, Bitmain's miner removal team attempted to access the Data Center Facility to begin extracting its mining equipment but was refused entry by the landlord, KAMCP.

62. Bennettech was unable to secure for Bitmain its contractually required access to the Data Center Facility, and on March 26, 2024, Bitmain was forced to file a lawsuit in the South Carolina Court of Common Pleas Fourth Judicial Circuit (the "KAMCP Litigation") seeking return of its Hosted Servers from KAMCP.

63. Bitmain has expended considerable effort to resolve the KAMCP Litigation. In this course of its negotiations with KAMCP, KAMCP has asserted various claims against Bitmain relating to damage to the Data Center Facility that KAMCP alleges occurred in connection with the preparation of the Data Center Facility for the bitcoin mining operation, activities for which Bennettech is responsible as the service provider. Bitmain was forced to enter into a confidential agreement with KAMCP to resolve these claims and secure the release of its Hosted Servers.

64. Bitmain has been forced to incur significant costs in order to secure the return of its Hosted Servers, including attorneys' fees, costs related to the resolution of the KAMCP Litigation, and costs related to the removal of the Hosted Servers.

65. The SFA requires Bennettech to indemnify Bitmain for its costs associated with the KAMCP Litigation and the removal of the Hosted Servers from the Data Center Facility.

66. Specifically, pursuant to Article 9.1 of the SFA, Bennettech agreed to

[I]ndemnify . . . BITMAIN . . . from and against any third-party action, claim, suit, proceeding, [or] demand . . . alleging any costs, losses, liabilities, damages . . . or expenses . . . directly or indirectly, as a result of, or based upon or arising out of: (i) Service Provider's performance of the Services hereunder; . . . (iii) any liability or damage incurred by reason of any act or omission of [Bennettech]; or (iv) facts, which if true, would constitute a breach of any of [Bennettech's] representations, warranties, or covenants hereunder, including, but not limited to, [Bennettech] fails to provide Services required by BITMAIN in accordance with this Agreement, such as frequent power outages at the Data Center Facility . . .

67. Pursuant to Article 9.2 of the SFA, Bennettech agreed to

[I]ndemnify . . . [Bitmain] . . . from and against any and all losses, liabilities, damages, . . . claims, obligations . . . costs and expenses (including reasonable attorneys' fees and court costs) resulting from or arising out of any breach or

11

omission of performance by [Bennettech] of any of the representations, covenants or other agreements in this Agreement.

68.     Bitmain's costs relating to the KAMCP Litigation directly result from Bennettech's breach of its obligations under the SFA, including the obligation to provide sufficient electric power to the Data Center Facility and to allow Bitmain access to the Data Center Facility after termination. Accordingly, Bennettech must indemnify Bitmain for these costs pursuant to Article 9.1 and 9.2 of the SFA.

69.     All costs relating to the resolution of the KAMCP Litigation also constitute costs arising from a third-party action related to the services provided under the SFA. Accordingly, Bennettech must indemnify Bitmain for costs relating to the resolution of the KAMCP Litigation pursuant to Article 9.1 of the SFA.

*Some of the Hosted Servers Have Been Lost*

70.     Bennettech also breached the SFA by failing to provide a safe environment for the Hosted Servers. The Hosted Servers are sophisticated electronic devices that are vulnerable to damage from a variety of sources, including water and moisture, temperature fluctuations, dust and debris, static electricity, and physical injury. As such, ASIC miners, such as the Hosted Servers, are typically stored in secured, climate-controlled data centers.

71.     Upon information and belief, due to the dispute between ARCm Realty and Marlboro Electric Cooperative, the Data Center Facility has not been climate-controlled and has lacked the ability to dehumidify the air, exposing the Hosted Servers to the risk of damage from, among other things, moisture and temperature fluctuations, since at least November 2023.

72.     Additionally, once Bitmain finally gained access to the Data Center Facility, it found that 281 of the Hosted Servers had been removed from the Data Center Facility.

73. By failing to provide a safe and secure environment for the Hosted Servers, Bennettech breached its obligations under the SFA, including but not limited to its representation and warranty that "[t]he Services shall be free from defects," Ex. 1, SFA, Article 4.2, and its obligation to "take standard industry practices and all necessary measures . . . to ensure safety and security of the Data Center Facility and the Hosted Servers against any safety accidents." Ex. 1, SFA, Article 6.5.

74. Accordingly, pursuant to the SFA, Bennettech must "make prompt payment of the fair market value for such Hosted Servers." *Id.*

75. The fair market value for the lost Hosted Servers is over $1.3 million.

## COUNT I
## BREACH OF CONTRACT

76. Bitmain repeats and realleges by reference the allegations contained in paragraph 1 through 75 as if fully set forth herein.

77. On or about August 5, 2023, Bitmain and Bennettech entered into the SFA.

78. The SFA is a valid and enforceable contract.

79. Bitmain fully performed its obligations under the SFA.

80. On or about August 5, 2023, Bitmain and Bennettech entered into the Service Order.

81. The Service Order is a valid and enforceable contract.

82. Bitmain fully performed its obligations under the Service Order.

83. Bennettech has materially breached its obligations under the SFA and the Service Order by, among other things:

   a. Failing to supply sufficient electrical power to the Data Center Facility, as required by Article 6.1 of the SFA and Article 2.1 of the Service Order;

    b. Failing to maintain an Online Status Ratio of 95% or greater as required by Article 6.9(c) SFA;

    c. Failing to maintain the safety and security of the Hosted Servers as required by Articles 4.2 and 6.5 of the SFA;

    d. Failing to pay the Theoretical Monthly Hosting Fee of $1,749,600 pursuant to Bitmain's termination of the SFA under Article 11.2(d) for Bennettech's continued breach of Article 6.9(c);

    e. Failing to return Bitmain $1,749,600 Deposit, as required by Article 11.3(a)(i);

    f. Failing to return Bitmain's $831,837.60 Prepayment, as required by Article 3.5(b); and

    g. Allowing 280 of Bitmain's Hosted Servers to be lost.

84. As a direct and proximate result of Bennettech's breaches, Bitmain has suffered monetary damages in an amount exceeding $5.6 million, which includes the wrongfully withheld Deposit, the wrongfully withheld Prepayment, the wrongfully withheld Theoretical Monthly Hosting Fee, and the fair market value of the 280 lost Hosted Servers.

85. Bitmain has also been unable to use the Hosted Servers since November 23, 2023 due to Bennettech's failure to provide sufficient power to the Data Center Facility, causing Bitmain to lose profits of over 350 bitcoin, currently valued at approximately $24.25 million, damages which continue to accrue each day Bitmain is unable to put the Hosted Servers to a productive use.

## COUNT II
### Indemnity

86. Bitmain repeats and realleges by reference the allegations contained in Paragraph 1 through 85 as if fully set forth herein.

87. Pursuant to Article 9.1 of the SFA, Bennettech agreed to indemnify Bitmain for its costs incurred in relation to any third-party action relating to the services Bennettech provided under the SFA.

88. Pursuant to Article 9.2 of the SFA, Bennettech agreed to indemnify Bitmain for its costs arising out of Bennettech's breach of the SFA.

89. Because of Bennettech's breach of its obligations under the SFA, including but not limited to its failure to provide electric power to the Data Center Facility for three months, Bitmain was entitled to—and did—terminate the SFA.

90. Because Bennettech breached its obligation to allow Bitmain to remove the Hosted Servers after the termination of the SFA, Bitmain was forced to bring an action in South Carolina state court against KAMCP, the owner of the Data Center Facility.

91. Bitmain incurred attorneys' fees in connection with the KAMCP Litigation and ultimately incurred costs related to the resolution of the KAMCP Litigation. Under Articles 9.1 and 9.2 of the SFA, Bennettech must indemnify Bitmain for all costs associated with the KAMCP Litigation.

## COUNT III
## NEGLIGENCE

92. Bitmain repeats and realleges by reference the allegations contained in paragraphs 1 through 91 as if fully set forth herein.

93. Bitmain provided Bennettech with 9,000 Hosted Servers, which are worth approximately $30M.

94. Bitmain entrusted the mining machines to Bennetech's care so that Bennetech could operate a bitcoin mining operation on behalf of Bitmain at the Bennetech Facility.

15

95. Bennetech had an obligation to exercise due care in the protection of Bitmain's property.

96. Bennettech failed to exercise due care in the protection of Bitmain's property.

97. As a result, 280 of the Hosted Servers have been lost while in Bennettech's care.

98. Accordingly, Bitmain is entitled to recover its actual and consequential damages in an amount to be proven in this arbitration.

## COUNT IV
## VEIL PIERCING/ALTER EGO

99. Bitmain repeats and realleges by reference the allegations contained in paragraphs 1 through 98 as if fully set forth herein.

100. Lamill Holding Company and AGA Mining, LLC are members of Bennettech (the "Members").

101. The Members used the corporate form of Bennettech as a sham to perpetrate a fraud.

102. The Members caused Bennettech to be used for the purpose of perpetrating an actual fraud.

103. The Members perpetrated an actual fraud on Bitmain primarily for the Member's direct benefit.

104. The Members used Bennettech's corporate form to justify a wrong.

105. Accordingly, Bennettech's corporate form should be disregarded.

106. Sparc acted as an extension of Bennettech relating to the misconduct described in this Arbitration Demand. Sparc contracted with Marlboro Electric Cooperative to provide electrical power to the Data Center Facility, and Sparc's failure to satisfy its obligations to

16

Marlboro Electric Cooperative caused one of the core breaches of the SFA, namely Bennettech's failure to provide sufficient power to the Data Center Facility.

107.    Bitmain seeks to pierce Bennettech's corporate veil to impose vicarious liability against the Members and Sparc.

## PRAYER FOR RELIEF

WHEREFORE, Bitmain respectfully requests that the arbitrator award the following relief:

A. Over $5.6 million and over 350 bitcoin in damages, including compensatory and actual damages, including but not limited to:

   a. $1,749,600, representing the amount of Bitmain's Deposit, which Bennettech has not returned;

   b. $831,837.60, representing the amount of Bitmain's Prepayment, which Bennettech has not returned.

   c. $1,749,600, representing the payment due to Bitmain under Articles 6.9(c) and 11.2(d) of the SFA;

   d. Over $1.3 million, representing the fair market value of the Hosted Servers lost due to Bennettech's breach of the SFA.

   e. Over 350 bitcoin in lost profits, a value of approximately $24.25 million based on the present price of bitcoin.

B. Bitmain's attorneys' fees and other costs incurred in relation to Bitmain's litigation against KAMCP, LLC relating to the return of the Hosted Servers, which total at least $150,000, including but not limited to:

   a. Costs related to the resolution of the KAMCP Litigation;

   b. Bitmain attorneys' fees; and

   c. Bitmain's costs incurred in removing the Hosted Servers from the Data Center

      Facility.

C. Attorneys' fees, expenses, and other out-of-pocket costs incurred by Bitmain in connection with this arbitration, including any costs and fees incurred by and payable to the arbitrator and any costs incurred in enforcing any such award, together with pre- and post-award interest, taxable costs, and accountants' and experts' fees and costs;

D. Pre-judgment interest; and

E. Any such other and further equitable relief as the Tribunal may deem just and proper.

      NELSON MULLINS RILEY & SCARBOROUGH LLP

*/s/Matthew G. Lindenbaum*_____
Matthew G. Lindenbaum
matthew.lindenbaum@nelsonmullins.com
One Financial Center, Suite 3500
Boston, MA 02111
(617) 217-4700

Paul Collins
Soren Young
1320 Main Street, 17th Floor
Columbia, SC 29201
Tel.: (803) 255-9729
paul.collins@nelsonmullins.com
soren.young@nelsonmullins.com

*Attorneys for Claimant*
*Bitmain Technologies Georgia Limited*

Dated: June 3, 2024