IN THE UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

LAMILL HOLDING COMPANY, AND
AGA CAPITAL, LLC,

                              Plaintiffs,

          vs.

BITMAIN TECHNOLOGY GEORGIA
LIMITED

                              Defendant.

Civil Action No. 4:24-cv-04267-JD

**Defendant's Answer to Complaint and
Counterclaims**

Defendant Bitmain Technology Georgia Limited[1] ("Bitmain") hereby submits its Answer, Affirmative Defenses, and Counterclaims in response to Plaintiffs Lamill Holding Company's ("Lamill") and AGA Capital, LLC's ("AGA") (collectively, "Plaintiffs") Complaint. Bitmain respectfully alleges and states the following:

**<u>JURISDICTION AND VENUE</u>**

1.      Bitmain is without sufficient knowledge to deny or admit the allegations in Paragraph 1, and therefore denies them.

2.      Bitmain is without sufficient knowledge to deny or admit the allegations in Paragraph 2, and therefore denies them.

3.      Admitted for jurisdictional purposes only.

4.      Paragraph 4 of the Complaint states a legal conclusion for which no response is required. To the extent this paragraph alleges more, Bitmain denies the allegations in Paragraph 4.

---

[1] Plaintiffs improperly named the defendant. Bitmain's proper name is Bitmain Technologies Georgia Limited.

1

5.      Paragraph 5 of the Complaint states a legal conclusion for which no response is required Bitmain admits that jurisdiction was proper in the Court of Common Pleas in the County of Marlboro, but notes that this matter has since been removed to this Court. To the extent this paragraph alleges more, Bitmain denies the allegations in Paragraph 5.

## GROUNDS FOR RELIEF

6.      Paragraph 6 of the Complaint states a legal conclusion for which no response is required To the extent this paragraph alleges more, Bitmain denies its allegations.

7.      Paragraph 7 of the Complaint states a legal conclusion for which no response is required. To the extent this paragraph alleges more, Bitmain denies its allegations.

8.      Paragraph 8 of the Complaint states a legal conclusion for which no response is required. To the extent this paragraph alleges more, Bitmain denies its allegations.

9.      Paragraph 9 of the Complaint states a legal conclusion for which no response is required. To the extent this paragraph alleges more, Bitmain denies its allegations.

10.      Denied on the basis of Bitmain's alter ego theory.

11.      Denied on the basis of Bitmain's alter ego theory.

12.      Bitmain admits only that it instituted an arbitration proceeding with the American Arbitration Association by way of filing a demand on June 3, 2024. To the extent this paragraph alleges more, Bitmain denies its allegations.

13.      Bitmain admits that its counsel is experienced and competent.  The remaining allegations are denied.

14.      Paragraph 14 of the Complaint states a legal conclusion for which no response is required. To the extent this paragraph alleges more, Bitmain denies its allegations.

15.      Denied.

16.    Denied.

17.    Paragraph 17 of the Complaint references a document which speaks for itself. Bitmain denies allegations inconsistent with that document.

18.    Denied.

19.    Denied.

20.    Denied.

21.    Admitted.

22.    Denied.

## PRAYER FOR RELIEF

23.    Bitmain denies that Plaintiffs are entitled to the relief sought in the unnumbered WHEREFORE clause.

## COMPREHENSIVE DENIAL

Any and all allegations in Plaintiffs' Complaint to which Bitmain has not expressly admitted hereby stand denied.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, because they fail to state a cause of action upon which relief can be granted.

### Second Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

### Third Affirmative Defense

Plaintiffs' claims are barred by the doctrine of waiver and/or estoppel.

### Fourth Affirmative Defense

Plaintiffs' damages, if any, were not proximately caused by Defendants.

### Fifth Affirmative Defense

Plaintiffs have not sustained any damages as a result of Defendants' acts or omissions.

### Sixth Affirmative Defense

Plaintiffs failed to mitigate damages.

## RESERVATION OF RIGHTS

Bitmain reserves its right to allege any further affirmative defenses that become known in the course of this litigation and related discovery.

## COUNTERCLAIMS

Defendant/Counter-Plaintiff Bitmain Technologies Georgia Limited ("Bitmain") hereby brings these Counterclaims against Plaintiffs/Counter-Defendants Lamill Holding Company ("Lamill") and AGA Capital, LLC ("AGA") (collectively, "Counter-Defendants").

## INTRODUCTION

1.    Bitmain brings these Counterclaims against Counter-Defendants, the members of Bennettech LLC ("Bennettech" or "Service Provider"), arising out of a breach of a Service Framework Agreement dated August 5, 2023 (the "SFA") through a theory of alter ego. A true and accurate copy of the SFA is attached as **Exhibit 1**.

2.    Counter-Defendants are each an alter ego of Bennettech for the reasons set forth below, including but not limited to their status as Bennettech's sole members, their funding of Bennettech, and their apparent creation of Bennettech as a shell entity to avoid all liabilities.

3.    Upon information and belief, Counter-Defendants created Bennettech as part of a complicated, but not overly sophisticated shell game in an attempt to gain profit yet avoid all

liabilities.

4.     In addition, Counter-Defendants created Sparc Foundry, LLC ("Sparc") to further their scheme.  Sparc is the 100% subsidiary of Bennettech, and Counter-Defendants are Bennettech's two members.  Sparc was formed for the sole purpose of entering into the contract with Marlboro Electric Company.  It has no revenue, no employees, and no books and records.

5.     Sparc has recently filed for bankruptcy, and its schedule indicated that in 2023, Bennettech made a loan and capital contribution of $3.3 million to Sparc. Sparc acted as an extension of Bennettech relating to the misconduct described in this Counterclaim.  Sparc contracted with Marlboro Electric Cooperative to provide electrical power to the Data Center Facility, and Sparc's failure to satisfy its obligations to Marlboro Electric Cooperative caused one of the core breaches of the SFA, namely Bennettech's failure to provide sufficient power to the Data Center Facility.

6.     As explained in greater detail below, Bitmain develops and manufactures application-specific integrated circuit ("ASIC") miners, specialized computers that are optimized to efficiently mine bitcoin.  Pursuant to the SFA, Bennettech agreed to provision and operate a data center in which Bitmain would use 9,000 ASIC miners (the "Hosted Servers") to generate revenue by mining Bitcoin.  The SFA required Bennettech to, *inter alia*, provide the significant amounts of electric power required to operate the Hosted Servers and to ensure the safety and security of the Hosted Servers.

7.     Bennettech leased a facility in Bennettsville, South Carolina (the "Data Center Facility") to house the Hosted Servers.  Bennettech did not lease the Data Center Facility directly from its owner, KAMCP, LLC ("KAMCP" or the "Landlord").  Rather, KAMCP leased the Data Center Facility to ARCm Realty LLC, which subleased the Data Center Facility to Woodlands

Edge, Inc., which subleased the Data Center Facility to Bennettech.

8.     In November 2023, after Bitmain's Hosted Servers had been online for only one month, the electric power provider, Marlboro Electric Cooperative, disconnected power to the Data Center Facility due to non-payment.  This rendered the Data Center Facility unfit for mining bitcoin and breached Bennettech's obligation under the SFA to provide sufficient poser to the Data Center Facility and the Hosted Servers.  Bennettech never remedied this breach.

9.     The Data Center Facility sat idle, each day depriving Bitmain of the ability to generate mining revenue, until June 2, 2024, when Bitmain exercised its right to terminate the SFA.

10.     Upon termination, Bennettech was required to return Bitmain's deposit and prepayment, totaling $2,581,437.60.  Also, because Bitmain terminated the SFA due to Bennettech's continuing failure to provide sufficient power to the Data Center Facility, the SFA required Bennettech to pay Bitmain $1,749,600, calculated based on the expected hosting fee for one month.  Bennettech has also failed to pay this contractually required amount.

11.      On January 30, 2023, Bitmain notified Bennettech that Bitmain would exercise its right to enter the Data Center Facility to remove Bitmain's Hosted Servers due to Bennettech's failure to provide sufficient power to the Data Center Facility.  This did not happen.  Instead, KAMCP, the landlord, refused to allow Bitmain or Bennettech to access the Data Center Facility and asserted that Bitmain was responsible for damage to the Data Center Facility that KAMCP alleged had occurred due to the bitcoin mining operation.  Bitmain was forced to file a lawsuit in South Carolina state court to recover its Hosted Servers.  Although Bitmain secured the release of its Hosted Servers, it incurred significant costs in relation to the removal of the Hosted Servers, damages that directly relate to Bennettech's operation of the Data Center Facility.  The SFA

requires Bennettech to indemnify Bitmain for all costs related to the litigation against KAMCP, including attorneys' fees, court costs, and the cost of the resolution of Bitmain's litigation with KAMCP.

12.     Bitmain brings these Counterclaims seeking damages from Counter-Defendants for Bennettech's numerous breaches of the SFA.

### THE PARTIES

13.     Counter-Plaintiff Bitmain Technologies Georgia Limited is a Georgia corporation headquartered in Roswell, Georgia.

14.     Counter-Defendant Lamill Holding Company is, upon information and belief, a corporation organized and existing pursuant to the laws of the state of Delaware.

15.     Counter-Defendant AGA Mining, LLC is, upon information and belief, a limited liability corporation organized and existing pursuant to the laws of the state of Delaware. Additionally, upon information and belief, AGA's individual members are Lixiong Hao and Jingrui Yu; both are residents of the State of California.

### JURISDICTION AND VENUE

16.     This action is within the original jurisdiction of this Court based on diversity of citizenship under 28 U.S.C. § 1332(a)(1).  The parties are complete diverse, and the amount of controversy exceeds $75,000.  Counter-Defendants are citizens of Delaware and California, and Bitmain is a citizen of Georgia.

17.     Venue is proper because a substantial part of the events giving rise to the claims alleged occurred in Marlboro County, South Carolina.

**GENERAL ALLEGATIONS**

*Bitcoin Mining*

18.     Bitcoin is a crypto-asset that uses cryptographic principles to allow owners of bitcoin to securely transact with each other and to prove ownership of bitcoin via the bitcoin blockchain, a decentralized public ledger.

19.     No single organization controls bitcoin.  Rather, the bitcoin crypto-protocol maintains the bitcoin blockchain and provides for new bitcoins to enter the economy through a mechanism known as "mining."  Individuals "mine" bitcoin by using sophisticated computer programs to perform complex, resource-intensive computations which validate past bitcoin transactions.  Once the transactions are validated, they are added to the bitcoin blockchain.

20.     The mining process is competitive.  The first miner to validate a block of transactions is rewarded with an amount of bitcoin, while other miners get nothing for that block. Blocks are mined on average once every ten minutes.  From 2020 through April 20, 2024, the reward for validating a block of transactions was 6.5 bitcoin.  Since April 20, 2024, the reward for validating a block of transactions has been 3.125 bitcoin.  Bitcoin miners can either sell the bitcoin for a fiat current, such as U.S. dollars, or hold the bitcoin as an investment.  At the current price of bitcoin, the reward for mining a single block of bitcoin is worth approximately $184,000.

21.     Because the computations required to mine bitcoin are highly complex, miners typically use machines equipped with application-specific integrated circuit ("ASIC") chips to stay competitive.  These machines are custom-built to efficiently mine bitcoin and can cost thousands of dollars.  To increase their profitability, miners often operate hundreds or even thousands of ASIC miners at a time.

22.     Bitcoin mining, especially at a commercial scale, consumes significant amounts of electric power.  Without a reliable source of electric power, ASIC miners cannot be put to a productive use.

23.     ASIC miners are sophisticated electronic devices.  As such, they are vulnerable to damage from a variety of sources, such as water and moisture, heat, dust and debris, static electricity, and physical injury.  To mitigate the risk of damage, ASIC miners are typically stored in secured, climate-controlled data centers.

***The Service Framework Agreement***

24.     On August 5, 2023, Bitmain and Bennettech entered into the SFA.

25.     The SFA is a valid and enforceable contract.

26.     The SFA incorporated a Service Order, attached to the SFA as Appendix I, which the Parties executed on August 5, 2023.

27.     The Service Order is a valid and enforceable contract.

28.     Pursuant to the SFA and the Service Order, Bennettech was required to, among other things, provision and operate a facility at which Bitmain would use the Hosted Servers to mine bitcoin.  Because Bennettech did not have a facility of its own suitable to operate the data center, it leased the Data Center Facility from a third party.

29.     On May 23, 2023,  Bennettech entered into an agreement with Woodlands Edge, Inc. ("Woodlands Edge") under which  Bennettech leased 100,000 square feet of facility located at 2066 Marlboro Way, Bennettsville South Carolina.  Ex. 1, SFA, Appendix A.

30.     Upon information and belief, Woodlands Edge leased the Data Center Facility from ARCm Realty, which leased the facility from KAMCP, the owner of the Data Center Facility.

31.     The Hosted Servers must be connected to electric power and to the internet to operate productively.  It therefore was critical to Bitmain in executing the SFA that Bennettech be able to provide a constant flow of sufficient power to the Data Center Facility.  Accordingly, Article 6.1 of the SFA required Bennettech to "provide Bitmain with sufficient . . . power load and facilities . . . reasonably required for the normal operation of the Hosted Servers."  Ex. 1, SFA, Article 6.1.

32.     Bennettech further agreed that "[t]he power load provided by Service Provider [i.e., Bennettech], shall satisfy the requirements of this Agreement, the Service Orders and standard operational conditions."  Ex. 1, Article 6.1(e).  Under the Service Order, Bennettech agreed to provide 30 MW of electric power to the Hosted Servers.  Ex. 1, Service Order, Article 2.1.

33.     Upon information and belief, Bennettech arranged for electric power to the Data Center Facility through Sparc, a South Carolina limited liability company whose sole member is Bennettech.  Sparc contracted with Marlboro Electric Cooperative, a local electric power company, to provide electric power to the Data Center Facility.

34.     Because it was important to Bitmain that the Hosted Servers be productively running as much as possible, the SFA required SPS to keep the Hosted Servers online on the monitoring software and contributing its computational power to the mining pool as designated by Bitmain at least 95% of the time, on average.  To measure this, the SFA defined "Online Status Ratio" as follows:

> "Online Status Ratio" means a fraction where the numerator is the sum of the actual length of time of each Hosted Server in Online Status during the applicable Billing Period, and the denominator is the product of the Hosting Quantity of Hosted Servers and the theoretical length of time of each Hosted Server in Online Status during the applicable Billing Period…

SFA, Article 1.1.

10

35.     Article 6.9(a) of the SFA required Bennettech to maintain an Online Status Ratio of at least 95%.

36.     If the Online Status Ratio dropped below 95%, the SFA gave Bennettech one month to remedy the situation, after which Bitmain could "terminate this Agreement with immediate effect without any liability for breach of contract." Ex. 1, SFA, Article 6.9(b-c).

37.     Bennettech was also required to "take standard industry practices and all necessary measures . . . to ensure the safety and security of the Data Center Facility." Ex. 1, SFA, Article 6.5.

38.     As compensation for Bennettech's services, Bitmain agreed to pay Bennettech a monthly fee (the "Hosting Fee") based on the number of Hosted Servers in operation at the Data Center Facility and the amount of electrical power consumed by the Hosted Servers during a given month. Ex. 1, SFA, Article 3.1.

39.     Upon the execution of the SFA, Bitmain agreed to pay Bennettech a Deposit in the amount of $1,749,600. Ex. 1, SFA, Article 3.4. The deposit was calculated based on the total number of Hosted Servers and their expected power consumption and was intended to represent the parties' best estimation of Bitmain's expected payments for one month:

| | | | |
|---|---|---|---|
| 3.1. | Deposit. BITMAIN shall pay to Service Provider the Deposit as set forth below in accordance with the Service Framework Agreement. | | |

| Batch No. | Hosting Quantity (Units) | Deposit Breakdown | Deposit (US$) |
|---|---|---|---|
| 1 | 9,000 | 9,000 × 3.6 (kW) × 0.075× 24 ×30 | 1,749,600.00 |
| In Total | 9,000 | - | 1,749,600.00 |

Ex. 1., Service Order, Article 3.1.

40.     On September 18, 2023, Bitmain paid Bennettech the $1,749,600 deposit.

41.     Bitmain also agree to render a $831,837.60 Prepayment to Bennettech in an amount based on Bitmain's expected monthly Hosting Fees.  Ex. 1, SFA, Article 3.5.

42.     On September 18, 2023, Bitmain paid Bennettech the $831,837.60 Prepayment.

43.     So that the parties could accurately estimate Bitmain's expected monthly payments under the contract, the SFA calculated a Monthly Theoretical Hosting Fee, which "means the theoretical amount of the Hosting Fee for one (1) month." Ex. 1, SFA, Article 1.1; Service Order, Article 3.2.  The Monthly Theoretical Hosting Fee under the SFA was $1,749,600.

***Bennettech Breaches the SFA By Failing to Provide Sufficient Power to the Data Center Facility***

44.     From August 24, 2023, to September 16, 2023, Bitmain transported its 9,000 Hosted Servers to the Bennettsville Facility and, from October 13, 2023, through November 23, 2023, Bitmain operated the Hosted Servers to mine bitcoin.

45.     At the time they were in operation, the Hosted Servers were capable of generating approximately 1.9 bitcoin in mining rewards each day, a value of approximately $112,000.00 at the current price of bitcoin.

46.     On November 23, 2023, electric power to the Bennettsville facility was disconnected. Upon information and belief, the electric power was disconnected because Sparc failed to pay the amounts due under its contract with Marlboro Electric Cooperative, its electric provider.

47.     The disconnection of electric power rendered the Data Center Facility useless for mining bitcoin and breached Bennettech's obligation under the SFA to "provide Bitmain with sufficient . . . power load and facilities . . . reasonably required for the normal operation of the Hosted Servers."  Ex. 1, SFA, Article 6.1.

48.     With the electric power to the Data Center Facility disconnected, the Hosted Servers could not operate and therefore were no longer Online.  Therefore, the Online Status Ratio for the Hosted Servers dropped below 95% in November 2023 and has been at 0% for every month since then.  By allowing the Online Status Ratio to drop below 95%, Bennettech breached Article 6.9 of the SFA.  Bennettech's failure to remedy this breach within one month allowed Bitmain to terminate the SFA.

*Bitmain Exercises Its Right to Terminate the SFA*

49.     On June 2, 2024, Bitmain informed Bennettech in writing that Bitmain was exercising its right to terminate the SFA pursuant to, among other provisions, Articles 6.9(c) and 11.2(d) due to Bennettech's failure to maintain a sufficient Online Status Ratio of the Hosted Servers for more than three months.

50.     Upon termination, Bennettech was required to return Bitmain's $1,749,600 deposit. Ex. 1, SFA, Article 11.3(a)(i).

51.     Bennettech was also required to return Bitmain's $831,837.60 Prepayment.

52.     Because Bitmain exercised its right to terminate the SFA due to Bennettech's unremedied breach of Article 6.9(c), Bennettech was also required to pay Bitmain compensation in an amount equal to the Monthly Theoretical Hosting Fee of $1,749,600.  Ex. 1, SFA, Article 11.2(c).

53.     Bennettech has failed to return the $1,749,600 Deposit, to return the $831,837.60 Prepayment, or to pay Bitmain the $1,749,600 compensation required due to its unremedied breach of Article 6.9(c).

54.     Accordingly, Bennettech is in breach of its post-termination payment obligations under the SFA.

***Bitmain is Forced to Incur Excessive Removal Costs Due to the Breach of the SFA***

55.     Pursuant to Article 6.7 of the SFA, Bitmain was to enjoy unfettered access to the Data Center Facility.

56.     Due to Bennettech's failure to supply sufficient power to the Data Center Facility, on January 30, 2024, Bitmain informed Bennettech that Bitmain intended to exercise its right under Article 6.7 of the SFA to access the Data Center Facility and remove Bitmain's Hosted Servers.

57.     On February 9, 2024, Bitmain's miner removal team attempted to access the Data Center Facility to begin extracting its mining equipment but was refused entry by the landlord, KAMCP.

58.     Bennettech was unable to secure for Bitmain its contractually required access to the Data Center Facility, and on March 26, 2024, Bitmain was forced to file a lawsuit in the South Carolina Court of Common Pleas Fourth Judicial Circuit (the "KAMCP Litigation") seeking return of its Hosted Servers from KAMCP.

59.     Bitmain has expended considerable effort to resolve the KAMCP Litigation.  In this course of its negotiations with KAMCP, KAMCP has asserted various claims against Bitmain relating to damage to the Data Center Facility that KAMCP alleges occurred in connection with the preparation of the Data Center Facility for the bitcoin mining operation, activities for which Bennettech are responsible as the service provider.  Bitmain was forced to enter into a confidential agreement with KAMCP to resolve these claims and secure the release of its Hosted Servers.

60.     Bitmain has been forced to incur significant costs in order to secure the return of its Hosted Servers, including attorneys' fees, costs related to the resolution of the KAMCP Litigation, and costs related to the removal of the Hosted Servers.

61.    The SFA requires Bennettech to indemnify Bitmain for its costs associated with the KAMCP Litigation and the removal of the Hosted Servers from the Data Center Facility.

62.    Specifically, pursuant to Article 9.1 of the SFA, Bennettech agreed to

[I]ndemnify . . . BITMAIN . . . from and against any third-party action, claim, suit, proceeding, [or] demand . . . alleging any costs, losses, liabilities, damages . . . or expenses . . . directly or indirectly, as a result of, or based upon or arising out of: (i) Service Provider's performance of the Services hereunder; . . . (iii) any liability or damage incurred by reason of any act or omission of [Bennettech]; or (iv) facts, which if true, would constitute a breach of any of [Bennettech's] representations, warranties, or covenants hereunder, including, but not limited to, [Bennettech] fails to provide Services required by BITMAIN in accordance with this Agreement, such as frequent power outages at the Data Center Facility . . .

63.    Pursuant to Article 9.2 of the SFA, Bennettech agreed to

[I]ndemnify . . . [Bitmain] . . . from and against any and all losses, liabilities, damages, . . . claims, obligations . . . costs and expenses (including reasonable attorneys' fees and court costs) resulting from or arising out of any breach or omission of performance by [Bennettech] of any of the representations, covenants or other agreements in this Agreement.

64.    Bitmain's costs relating to the KAMCP Litigation directly result from Bennettech's breach of its obligations under the SFA, including the obligation to provide sufficient electric power to the Data Center Facility and to allow Bitmain access to the Data Center Facility after termination. Accordingly, Counter-Defendants as alter egos of Bennettech must indemnify Bitmain for these costs pursuant to Article 9.1 and 9.2 of the SFA.

65.    All costs relating to the resolution of the KAMCP Litigation also constitute costs arising from a third-party action related to the services provided under the SFA. Accordingly, Counter-Defendants as the alter egos of Bennettech must indemnify Bitmain for costs relating to the resolution of the KAMCP Litigation pursuant to Article 9.1 of the SFA.

***Some of the Hosted Servers Have Been Lost***

66.    Bennettech also breached the SFA by failing to provide a safe environment for the Hosted Servers. The Hosted Servers are sophisticated electronic devices that are vulnerable to

damage from a variety of sources, including water and moisture, temperature fluctuations, dust and debris, static electricity, and physical injury. As such, ASIC miners, such as the Hosted Servers, are typically stored in secured, climate-controlled data centers.

67. Upon information and belief, due to the dispute between ARCm Realty and Marlboro Electric Cooperative, the Data Center Facility has not been climate-controlled and has lacked the ability to dehumidify the air, exposing the Hosted Servers to the risk of damage from, among other things, moisture and temperature fluctuations, since at least November 2023.

68. Additionally, once Bitmain finally gained access to the Data Center Facility, it found that 281 of the Hosted Servers had been removed from the Data Center Facility.

69. By failing to provide a safe and secure environment for the Hosted Servers, Bennettech breached its obligations under the SFA, including but not limited to its representation and warranty that "[t]he Services shall be free from defects," Ex. 1, SFA, Article 4.2, and its obligation to "take standard industry practices and all necessary measures . . . to ensure safety and security of the Data Center Facility and the Hosted Servers against any safety accidents." Ex. 1, SFA, Article 6.5.

70. Accordingly, pursuant to the SFA, Bennettech must "make prompt payment of the fair market value for such Hosted Servers." *Id.*

71. The fair market value for the lost Hosted Servers is over $1.3 million.

***Counter-Defendants Used Bennettech's Corporate Formation as a Sham to Perpetuate Wrongs on Bitmain***

72. Lamill and AGA are the sole members of Bennettech.

73. Bennettech has no other operations beyond the Bennettsville contract.

74.     Lamill and AGA have complete control over Bennettech and Bennettech has no separate interest of its own; it exists solely to achieve the goals of Lamill and AGA.

75.     Lamill and AGA established Bennettech and its subsidiary, Sparc, in order to perpetuate fraud and injustice upon parties such as Bitmain.  Specifically, AGA and Lamill knew that Bennettech and Sparc could not meet its contractual obligations, yet formed the entities in a manner that AGA and Lamill believed would relieve them of any resulting liabilities.

76.     Bennettech, LLC is the sole member of Sparc Foundry LLC ("Sparc"), a limited liability company formed under the laws of the State of South Carolina.

77.     Sparc was formed for the sole purpose of entering into the contract with Marlboro Electric Cooperative. It has no revenue, no employees, and no books and records.

78.     Bennettech, Lamill, AGA, and Sparc share the same address: 215 East Bayt St., Suite 201k #1712, Charleston, SC 29401.

79.     On June 12, 2024, Sparc commenced a voluntary bankruptcy under Chapter 7 of the bankruptcy code, a liquidation proceeding in which an independent trustee is charged with investigating the assets of the debtor and liquidating any available assets for the benefit of creditors (the "Bankruptcy Case"). Bitmain is identified as a creditor in the Bankruptcy Case due to the Arbitration Demand. *See Sparc Foundry*, Case No. 24-02116 (Bankr. S.C.).

80.     The schedules filed by Sparc indicate that in 2023, Bennettech made a "loan and capital contribution" of $3,368,178.22 to Sparc.  Sparc's representatives could not recall how much was loan and how much was capital.

81.     On July 8, 2024, and August 2, 2024, the Office of the U.S. Trustee conducted a meeting of the creditors in the Bankruptcy Case in accordance with 11 USC § 341 (the "341 Meeting"). Sparc appeared at the 341 Meeting through Lixiong Hao and Jungrui Yu.  At the 341

Meeting Hao and Yu testified that Sparc was formed for the sole purpose of entering into the contract with Marlboro Electric Cooperative.  Hao and Yu further testified that they were the sole members of AGA Capital.

82.    The Trustee declared the Bankruptcy Case to be an asset case.

83.    Sparc acted as an extension of Bennettech relating to the misconduct described in this Counterclaim.  Sparc contracted with Marlboro Electric Cooperative to provide electrical power to the Data Center Facility, and Sparc's failure to satisfy its obligations to Marlboro Electric Cooperative caused one of the core breaches of the SFA, namely Bennettech's failure to provide sufficient power to the Data Center Facility.

## COUNT I
## VEIL PIERCING/ALTER EGO

84.    Bitmain repeats and realleges by reference the allegations contained in paragraphs 1 through 83 as if fully set forth herein.

85.    The Counter-Defendants are the sole members of Bennettech.

86.    The Counter-Defendants have total domination and control over Bennettech.

87.    The Counter-Defendants used the corporate form of Bennettech as a sham to perpetrate a fraud and breach a contract.

88.    The Counter-Defendants caused Bennettech to be used for the purpose of perpetrating an actual fraud.

89.    The Counter-Defendants perpetrated an actual fraud on Bitmain primarily for the Counter-Defendants direct benefit.

90.    The Counter-Defendants used Bennettech's corporate form to justify a wrong.

91.    Accordingly, Bennettech's corporate form should be disregarded.

92.     In addition, Counter-Defendants formed Sparc to perpetuate the fraud.  Specifically, Sparc was formed solely to enter into a contract with Marlboro Electric.

93.     Sparc acted as an extension of Bennettech relating to the misconduct described in this Counterclaim.  Sparc contracted with Marlboro Electric Cooperative to provide electrical power to the Data Center Facility, and Sparc's failure to satisfy its obligations to Marlboro Electric Cooperative caused one of the core breaches of the SFA, namely Bennettech's failure to provide sufficient power to the Data Center Facility.

94.     Bitmain seeks to pierce Bennettech's corporate veil to impose vicarious liability against the Counter-Defendants.

**COUNT II**
**BREACH OF CONTRACT**
**(Through the actions of Counter-Defendants alter ego, Bennettech)**

95.     Bitmain repeats and realleges by reference the allegations contained in paragraph 1 through 94 as if fully set forth herein.

96.     On or about August 5, 2023, Bitmain and Bennettech entered into the SFA.

97.     The SFA is a valid and enforceable contract.

98.     Bitmain fully performed its obligations under the SFA.

99.     On or about August 5, 2023, Bitmain and Bennettech entered into the Service Order.

100.    The Service Order is a valid and enforceable contract.

101.    Bitmain fully performed its obligations under the Service Order.

102.    Bennettech has materially breached its obligations under the SFA and the Service Order by, among other things:

    i.  Failing to supply sufficient electrical power to the Data Center Facility, as required by Article 6.1 of the SFA and Article 2.1 of the Service Order;

    ii.   Failing to maintain an Online Status Ratio of 95% or greater as required by Article 6.9(c) SFA;

    iii.   Failing to maintain the safety and security of the Hosted Servers as required by Articles 4.2 and 6.5 of the SFA;

    iv.   Failing to pay the Theoretical Monthly Hosting Fee of $1,749,600 pursuant to Bitmain's termination of the SFA under Article 11.2(d) for Bennettech's continued breach of Article 6.9(c);

    v.   Failing to return Bitmain $1,749,600 Deposit, as required by Article 11.3(a)(i);

    vi.   Failing to return Bitmain's $831,837.60 Prepayment, as required by Article 3.5(b); and

    vii.   Allowing 280 of Bitmain's Hosted Servers to be lost.

103.    As a direct and proximate result of Bennettech's breaches, Bitmain has suffered monetary damages in an amount exceeding $5.6 million, which includes the wrongfully withheld Deposit, the wrongfully withheld Prepayment, the wrongfully withheld Theoretical Monthly Hosting Fee, and the fair market value of the 280 lost Hosted Servers.

104.    Bitmain has also been unable to use the Hosted Servers since November 23, 2023 due to Bennettech's failure to provide sufficient power to the Data Center Facility, causing Bitmain to lose profits of over 350 bitcoin, currently valued at approximately $20.65 million, damages which continue to accrue each day Bitmain is unable to put the Hosted Servers to a productive use.

## COUNT III
**Indemnity**
**(Through the actions of Counter-Defendants alter ego, Bennettech)**

105. Bitmain repeats and realleges by reference the allegations contained in Paragraph 1 through 104 as if fully set forth herein.

106. Pursuant to Article 9.1 of the SFA, Bennettech agreed to indemnify Bitmain for its costs incurred in relation to any third-party action relating to the services Bennettech provided under the SFA.

107. Pursuant to Article 9.2 of the SFA, Bennettech agreed to indemnify Bitmain for its costs arising out of Bennettech's breach of the SFA.

108. Because of Bennettech's breach of their obligations under the SFA, including but not limited to its failure to provide electric power to the Data Center Facility for three months, Bitmain was entitled to—and did—terminate the SFA.

109. Because Bennettech breached its obligation to allow Bitmain to remove the Hosted Servers after the termination of the SFA, Bitmain was forced to bring an action in South Carolina state court against KAMCP, the owner of the Data Center Facility.

110. Bitmain incurred attorneys' fees in connection with the KAMCP Litigation and ultimately incurred costs related to the resolution of the KAMCP Litigation. Under Articles 9.1 and 9.2 of the SFA, Bennettech must indemnify Bitmain for all costs associated with the KAMCP Litigation.

## COUNT IV
**NEGLIGENCE**
**(Through the actions of Counter-Defendants alter ego, Bennettech)**

111. Bitmain repeats and realleges by reference the allegations contained in paragraphs 1 through 110 as if fully set forth herein.

112.    Bitmain provided Bennettech with 9,000 Hosted Servers, which are worth approximately $30M.

113.    Bitmain entrusted the mining machines to Bennettech's care so that they could operate a bitcoin mining operation on behalf of Bitmain at the Bennettech Facility.

114.    Counter-Defendants as alter egos of Bennettech had an obligation to exercise due care in the protection of Bitmain's property.

115.    Counter-Defendants as alter egos of Bennettech failed to exercise due care in the protection of Bitmain's property.

116.    As a result, 280 of the Hosted Servers have been lost while in Counter-Defendants as alter egos of Bennettech's care.

117.    Accordingly, Bitmain is entitled to recover its actual and consequential damages in an amount to be proven in this arbitration.

## PRAYER FOR RELIEF

WHEREFORE, Bitmain respectfully requests that the Court award the following relief:

A.  Pierce Bennettech's corporate veil and determine that Counter-Defendants are operating as Bennettech's alter ego.

B.  Over $5.6 million and over 350 bitcoin in damages, including compensatory and actual damages, including but not limited to:

   a.  $1,749,600, representing the amount of Bitmain's Deposit, which Counter-Defendants as alter egos of Bennettech has not returned;

   b.  $831,837.60, representing the amount of Bitmain's Prepayment, which Counter-Defendants as alter egos of Bennettech have not returned.

    c.  $1,749,600, representing the payment due to Bitmain under Articles 6.9(c) and 11.2(d) of the SFA;

    d.  Over $1.3 million, representing the fair market value of the Hosted Servers lost due to Counter-Defendants as alter egos of Bennettech's breach of the SFA.

    e.  Over 350 bitcoin in lost profits, a value of approximately $20.65 million based on the present price of bitcoin.

C.  Bitmain's attorneys' fees and other costs incurred in relation to Bitmain's litigation against KAMCP, LLC relating to the return of the Hosted Servers, which total at least $150,000, including but not limited to:

    a.  Costs related to the resolution of the KAMCP Litigation;

    b.  Bitmain attorneys' fees; and

    c.  Bitmain's costs incurred in removing the Hosted Servers from the Data Center Facility.

D.  Attorneys' fees, expenses, and other out-of-pocket costs incurred by Bitmain in connection with this litigation, together with pre- and post-award interest, taxable costs, and accountants' and experts' fees and costs;

E.  Pre-judgment interest; and

F.  Any such other and further equitable relief as the Tribunal may deem just and proper.

(Signature Page to Follow)

NELSON MULLINS RILEY & SCARBOROUGH LLP


*/s/ Paul Collins*
Paul Collins
Federal Bar No. 9055
1320 Main Street, 17th Floor
Columbia, SC 29201
Tel.: (803) 255-9729
paul.collins@nelsonmullins.com
soren.young@nelsonmullins.com

*Attorney for Claimant*
*Bitmain Technologies Georgia Limited*


Dated: August 21, 2024